**INTERNATIONAL ASS'N OF MACHIN-
ISTS, TOOL AND DIE MAKERS LODGE
NO. 35, v. NATIONAL LABOR RELA-
TIONS BOARD.**

No. 7258.

United States Court of Appeals for the
District of Columbia.

Decided Nov. 20, 1939.

Joseph A. Padway and Herbert S. Thatcher, both of Washington, D. C., for petitioners.

Charles Fahy,· Gen. Counsel, Robert B. Watts, ·Asst. Gen. Counsel, and Laurence A. Knapp, Atty. National Labor Relations Board; all of Washington, D. C., for respondent.

Before GRONER, Chief Justice, and MILLER and RUTLEDGE, Associate Justices.

RUTLEDGE, Associate Justice.

The Serrick Corporation, of Ohio, has a plant in Muncie, Indiana, in which it manufactures bolts and screws, automobile moldings, refrigerator parts, and stenotype machines. It is engaged in interstate commerce and has an annual pay roll in excess of one million dollars. Its relations with three labor organizations, which we designate as indicated below,[1] are in question here. I.A.M. has appealed from findings and an order of the National Labor Relations Board (8 N.L.R.B. 621). The findings were to the effect that the employer had engaged in unfair labor practices within the meaning of Sec. 8(1), (2), (3) and (5), and Sec. 2(6) and (7), of the Wagner Act.[2] The order directed the employer to cease and desist from the unfair practices and to take specified affirmative remedial action. In general, findings and order sustained the contentions of U.A.W. Briefly, the order required the employer to cease giving effect to an alleged closed-shop contract with I.A.M. covering the toolroom; to deal with U.A.W. as the exclusive bargaining agent of its employees, including toolmen, but excluding buffers, polishers, supervisory, and clerical employees; to desist from various practices of assistance and encouragement to I.A.M. and discrimination against U.A.W.; and to reinstate and make whole certain employees improperly discharged. The employer has accepted and complied with the order. The principal issues involve the portions of the findings and order which relate to the toolroom. These held, in substance, that I.A.M. received unlawful assistance from the employer in organizing the toolroom and securing designation by it as bargaining agent; that for this and other reasons the toolroom was not a unit appropriate for collective bargaining or other purposes

---

[1] Local 459, International Union, United Automobile Workers of America, will be called "U.A.W.," except as the context clearly indicates reference to the International Union. Both are affiliated with the Congress for Industrial Organization, which we call "C.I.O."

Lodge No. 35, International Association of Machinists, Tool and Die Makers, and Production Lodge No. 1200, are affiliated with the International Association of Machinists, and through it with the American Federation of Labor, designated "A.F.L." Lodge No. 35 and Lodge No. 1200 will be called "I.A.M.," except as specifically designated by their respective numbers, when separate treatment is required.

Affiliated also with .A.F.L. is Metal Polishers, Buffers, Platers and Helpers International Union, Local 453, which will be referred to as "Local 453, Buffers and Polishers." This organization is not involved here, except by reference in some of the evidence.

[2] 29 U.S.C.A. § 158(1), (2), (3), (5), and § 152(6), (7). The latter define "commerce" and "affecting commerce." The former provide:

"It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title.

"(2) To dominate or interfere with· the formation or administration of any labor organization or contribute financial or other support to it * * *.

"(3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this chapter, or in * * * any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this chapter as an unfair labor practice) to require as a condition of employment membership therein, if such labor organization is the representative of the employees as provided in section ·159(a) of this title, in the appropriate collective bargaining unit covered by such agreement when made.

* * * * * *

"(5) To refuse to· bargain collectively with the representatives of his employees, subject to the provisions of section 159 (a) of this title."

of the Act; and that consequently[3] the closed-shop contract with I.A.M. was invalid. I.A.M. contends that the Board acted arbitrarily in two respects: (1) in finding that I.A.M. received unlawful aid from the employer, or, stating the matter otherwise, that there was no substantial evidence to sustain the findings in this respect; and (2) in holding that the toolroom was not an appropriate unit.

I.A.M. also challenges the portions of the order which require the employer to deal exclusively with U.A.W. as representative of the production employees. This is done because the Board refused to hold an election prior to its decision on July 27, 1938, and to defer its decision pending an election, notwithstanding it was advised by I.A.M. on July 23 that a majority of the production employees had shifted affiliation from U.A.W. to I.A.M. between the hearing, which ended on November 15, 1937, and the date of the order. This contention may be disposed of briefly, before turning to the principal issues.

I. At the hearing it was stipulated that U.A.W. held applications of a large majority of the production employees. Furthermore, the evidence shows that this majority had been created as early as the preceding 10th of August. No attempt was made by I.A.M. at the hearing to show that such a shift had then occurred. Nothing in the record indicates that it took place. Notice of I.A.M.'s claim of subsequent change was not given to the Board until four days prior to its decision. No effort was made, pursuant to Section 10 (e), 29 U.S.C.A. § 160(e), to apply to a court for leave to adduce additional evidence. In addition to failure to exhaust this judicial remedy, two considerations support the Board's refusal to call an election in the present circumstances. First, there is nothing to indicate that the unfair practices, which the Board and (as will appear) we have found existed, were remedied until after the order was entered. Therefore, any shift in majority affiliation between the hearing and the decision, had it occurred, presumably must have been af-

fected or effected by them. Furthermore, the case is not one in which the majority at the time of the hearing was doubtful or improperly constituted, as by the employer's aid or inclusion of ineligible members. Whatever may be the rule when such defects exist,[4] in their absence the presumption arises that the freely established majority continues until the Board has an opportunity to make its decision.[5] In its discretion it may hear additional evidence as to the majority's continued existence. But these presumptions, when sustained by the facts, should prevent its refusal to do so from being arbitrary, as against mere ex parte and self-serving assertions that a shift has occurred. Any other rule would make a merry-go-round of the Act, since like representations could be made in turn following each new one by the contending unions in order to prevent or delay a decision contrary to their interests, with no other result than to maintain the proceeding in a state of indefinite suspension and indecision. This view does no more than afford the Board a reasonable opportunity to perform its functions under the Act. It does not deprive employees of the power to select their representatives by choice of the majority. If conditions have changed and a majority now wish to join a local of I.A.M., they may do so and call for an election.[6]

II. Upon the principal issues, first a preliminary and then a more complete statement of the circumstances out of which this controversy arose are required. Serrick Corporation was organized under the laws of Ohio with authority to do business in Indiana. It has a plant in Defiance, Ohio, with which we are not concerned. Late in 1936 it acquired the business of Acme Machine Products Company, of Muncie, Indiana, and in January, 1937, that of John Lees Company, of Indianapolis. It brought the Lees Company assets and some of its personnel, including both managing officers and employees, to Muncie. Thereafter it operated the business derived from the two companies as a single enterprise under a single roof as the "Acme-Lees Division." It employed some 800 persons, of whom approximately

---

3 See the proviso to § 158(3), cit. supra, note 2, and text circa note 9, infra.

4 Cf. National Labor Relations Board v. Fansteel Metallurgical Corp., 1939, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599.

5 Cf. National Labor Relations Board v. Remington-Rand, Inc., 1938, 2 Cir., 94

F.2d 862, 869, 870, certiorari denied, 1938, 304 U.S. 576, 58 S.Ct. 1046, 82 L. Ed. 1540; National Labor Relations Board v. Biles-Coleman Lumber Co., 1938, 9 Cir., 96 F.2d 197, 198.

6 In re Cudahy Packing Co., 1939, 13 N.L.R.B. No. 61.

65 or more were supervisory and clerical, 63 were in the toolroom, 75 were buffers and polishers, and 577 were production employees. Prior to the merger there existed in the old Acme Company a so-called employees' organization, the Acme Welfare Association, which the company sponsored, checking off weekly dues from wages of employees who did not protest too greatly and taking active part in its affairs through executive officers. Funds were used for social and athletic purposes and operation of a cafeteria located in the plant. At the time of and following the merger, the Muncie plant was unorganized, but Serrick Corporation kept Acme Welfare Association in existence much as its predecessor had done, expanding it by including as members employees brought to Muncie from Indianapolis.

In March officials of the company began to address the Association on the subject of "outside" unions, adversely to the latter, although at the same time the company made a collective bargaining contract with Local 453, Buffers and Polishers. In May U.A.W. began an intensive plant-wide campaign to enroll all employees, except supervisory and clerical ones and buffers and polishers, all of whom were ineligible to membership. The employer immediately converted Acme Welfare into an active company union to hold employees in line and keep them out of U.A.W. The company's opposition was strenuous and determined. During June and early July numerous and persistent unfair labor practices were perpetrated. Nevertheless, U. A.W.'s campaign gained in effectiveness during June, July, August, and even in September. On August 10 it had acquired a clear majority of all eligible employees and demanded exclusive bargaining rights for them, including the toolroom. On August 16 U.A.W. filed with the Board a petition for certification under Sec. 9(c) of the Act, as exclusive representative of production workers.[7] The climax came in a strike on August 25 because of the company's refusal to recognize and deal with U.A.W. as exclusive bargaining agency.

I.A.M. did not appear upon the scene officially until July 28. As will be shown later in detail, the company failed in its use of Acme Welfare to oppose U.A.W. and abandoned it as a company union about the middle or latter part of July. At the same time a group of toolroom employees began to discuss and promote organization of that room for I.A.M.' Their efforts resulted in a meeting with an organizer for I.A.M. on July 28, at which a narrow majority of toolmen signed I.A.M. cards. In rapid succession followed negotiations with the management, recognition and signing of the closed-shop contract covering the toolroom on August 11. The contract was antedated to August 6.

Before setting forth further essential facts, a more concrete statement of the basic issues is appropriate. The nature and importance of the issues, together with the division between the Board and its trial examiner[8] and that within this court regarding them, also require a more detailed examination of the evidence than ordinarily is necessary.

■ III. Two basic issues are involved. Under the Wagner Act a closed-shop contract is valid only if it is made with a labor organization which is (1) "not established, maintained, or assisted" by any unfair labor practice; and (2) is the representative of the employees in the appropriate unit covered by the agreement when made.[9] Appropriateness of the unit and freedom of the union are essential and independent conditions.

■ The power to determine appropriateness of the unit is vested in the Board, not in the employees, the trial examiner or the courts.[10] The Board determines also whether the employer has given unlawful aid and comfort to the union. Both issues are presented here.

[7] The petition was amended September 27 to include toolroom employees. On October 5 the Board issued a complaint against the corporation charging, among other things, that it had improperly discharged 17 production workers and 18 toolroom employees. The corporation answered denying the charges, and alleging that the discharge of the toolmen was obligatory under the closed-shop contract. On October 14 I.A.M. intervened. From October 18 to November 15 the trial examiner heard evidence, and in February, 1938, made his findings and recommendations to the Board. As to their nature, see note 8, infra.

[8] His findings and recommendations with respect to the toolroom were favorable to I.A.M.'s contentions, but the Board was unanimous in taking the opposite view. As to other matters, the examiner and the Board were in substantially complete agreement.

[9] See the proviso to § 158 (3), cit. supra, note 2.

[10] 29 U.S.C.A. § 159(b).

They partially overlap but are not co-terminous. Unlawful aid incapacitates a labor union to act as the statutory representative. It is relevant also to appropriateness of the unit, perhaps so far that it vitiates the unit of its own force, certainly to the extent that the Board does not act arbitrarily by considering it in determining whether the unit is appropriate. But absence of such aid does not of itself render a unit appropriate or a decision of the Board that it is not so, arbitrary. Independently of any finding concerning unfair labor practices, the Board is empowered to determine the unit which is appropriate in the circumstances of the case.

IV. In the decision of questions of fact, the Board's findings are made conclusive, if supported by evidence,[11] which must be substantial.[12] But it is only convincing, not lawyers' evidence which is required. The Board is not limited to rules of evidence prevailing in courts of law or equity.[13] The evidence must be such as a reasonable mind might accept, though other like minds might not do so. The statutory mandate dispensing with judicial technicalities in procedure binds the reviewing court to the same extent as it does the Board. The review is of administrative action taken by direction of Congress according to administrative, not judicial, procedure. The reviewing court cannot reweigh the evidence in scales which a trial court would use in deciding whether to admit it. We are required to sustain the Board's findings, if reasonable minds, unhampered by preconceptions derived from the technical law of evidence, might differ as to conclusions to be drawn from the evidence presented. Nor can we exclude from consideration on review evidence which the Board was entitled to take into account. We think the evidence was clearly sufficient to sustain the Board's finding that the employer gave unlawful aid to I.A.M. and to show that its decision concerning the appropriate unit was not arbitrary.

V. As to the first question, we are required to determine, preliminarily, what evidence should be taken into account. To support the view that organization of the toolroom for I.A.M. was an entirely free and spontaneous movement of the toolmen, not aided by any unfair labor practice, it is argued that what occurred in the toolroom between July 28 and August 6, when the company consented to the closed-shop provision, was wholly separate and disconnected from the remainder of the long and plant-wide controversy; that what took place elsewhere in the plant before, during and after this brief period has no bearing upon the organization for I.A.M. or upon its negotiations and agreement with the management. As petitioner states the argument, "the record is clear that there were no employer activities of any kind, coercive or otherwise, operating in any way to assist the International Association of Machinists in acquiring membership prior to the 28th of July. Since at that time the I.A.M. had obtained an uncoerced majority, any subsequent activities on the part of the employer are either irrelevant or are permissive under the Act." In effect we are asked to confine our own and the Board's consideration of the evidence to occurrences in the toolroom during a nine-day interval. We are unable to separate events so artificially from their background and consequences,[14] and from the general contemporaneous current of which they were integral parts. To do so would be not only to ignore the most significant evidence in the record, but also to go counter to the plain mandate of the statute.

VI. The toolroom episode was merely one phase of a plant-wide controversy lasting from May to October. The tool-

---

[11] Id., § 160(e).

[12] Consolidated Edison Co. v. National Labor Relations Board, 1938, 305 U.S. 197, 229, 230, 59 S.Ct. 206, 83 L.Ed. 126.

[13] 29 U.S.C.A. § 160(b); Consolidated Edison Co. v. National Labor Relations Board, cit. supra note 12.

[14] The Board, consistently and with judicial approval, has considered "background" evidence in unfair practice cases, particularly when, as here, it discloses a prior hostile attitude of the employer. Pennsylvania Greyhound Lines, Inc., 1935, 1 N.L.R.B. 1, 23, affirmed, 1938, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; Wheeling Steel Corp., 1936, 1 N.L.R.B. 699, 709, enforced, 1938, 6 Cir., 94 F.2d 1021; National Labor Relations Board v. National Motor Bearing Co., 1939, 9 Cir., 105 F.2d 652; Hamilton-Brown Shoe Co. v. National Labor Relations Board, 1939, 8 Cir., 104 F.2d 49, 52. Subsequent occurrences similarly have been taken into account. National Labor Relations Board v. National Motor Bearing Co., supra.

room was geared closely to the productive work in function, physical location and human associations. Its job, described as "the beginning of production," was to keep the plant's machinery in working order. It was located in a rectangular space in the center of the single large room of similar shape which housed the entire plant and was set off from the remainder only by a wire fence. Toolroom workers went and came constantly among production workers. The toolroom and the production department were physically adjacent, intimately associated and functionally interdependent. What affected one had immediate repercussions in the other, whether in mechanical operations or human relations. Such interdependency cannot be outweighed or disregarded merely by reason of the fact that the toolmen, on the whole,[15] were more highly skilled and paid than production workers. All were part and parcel of the same plant and process, and of the long-continued labor conflict which enveloped the whole.

In these circumstances the toolroom became a "key point" in the labor controversy. If compliant with the employer's desires, it gave the company opportunity to resist and possibly defeat a general campaign to organize the plant by undesired "invaders." The evidence, summarized by the Board in its findings, shows that the employer seized the opportunity when other means had failed. The employer's close connection with the organization of the toolroom is shown by (1) its strenuous and unrelenting campaign from May to October[16] to keep U.A.W. out of every part of its plant, regardless of employees' wishes and by almost every known kind of unfair labor practice short of physical force; (2) affirmative assistance given to I.A.M. directly and openly by the management and more subtly through its representatives in the toolroom. Without effort to distinguish "misfeasance" against U.A.W. from positive aid to I.A.M., a chronological summary of the principal events, with emphasis upon facts showing the true relation of the active employee organizers of Lodge No. 35, I.A.M., to the management, will show not only the existence of the unfair practices, but also their connection with and relevance to the toolroom and its organization.

At the time of the merger, Serrick Corporation inherited from Acme Machine Products Company (Muncie) and John Lees Company (Indianapolis) not only plant, equipment and good will, but also managing officers and employees, as well as the then innocuous employees' "social" organization, Acme Welfare. Among executives were Murphy, vice president and general manager, Westlund, works manager, and Wise, tool supervisor, who came from John Lees Company, and Lewis, personnel director (also president of Acme Welfare), who came from the Acme Company. Significantly, among John Lees Company employees inherited after long service with Murphy, Westlund and Wise at Indianapolis, were McCoy, toolroom foreman, and Byroad, Fouts, Shock, Baker, Bolander and Dininger, who (except McCoy) became the chief open organizers of the toolroom for I.A.M. Sharpe, toolroom committeeman for Acme Welfare (until July when he joined U.A.W.), came with Lewis, his schoolmate and boyhood friend, from Acme Machine Products Company. As bearing upon the alleged independence and freedom of the toolroom from employer domination, pressure and interference in lining up with I.A.M., the relations between these executives and employees require close scrutiny. The most active open organizers for I.A.M. were Fouts, Shock, Byroad and Bolander, with Baker and Dininger assisting. The first four also, together with Sharpe, were active in the company union, Acme Welfare, until it "blew up" almost contemporaneously with the entry of I.A.M. All four had worked with Murphy, Westlund and McCoy, three of them for periods extending from ten to fourteen years, Bolander for at least four years. With these facts in mind a summary of the main course of events will throw light on the question whether they acted freely and independently or as minions of the employer.

After the merger, as has been stated, the plant continued unorganized, except that Acme Welfare continued as before, Lewis maintaining his dual role, as personnel director and Acme president. In February or March Lewis and Poole (Westlund's predecessor) through Acme Welfare and otherwise warned employees against "outside" unions, but at the same time the company made the collective bar-

---

[15] The record shows that some production employees received wages equal to those generally paid in the toolroom.

[16] Unless otherwise indicated, all dates referred to were in 1937.

gaining agreement with Local No. 453, Buffers and Polishers, A.F.L. affiliate, apparently without objection or resistance.[17] In May U.A.W. began actively to organize the plant. The company responded with a vigorous, almost violent, campaign to keep it out. Acme came to life, under Lewis' vivifying power, as a company union, avowedly to resist U.A.W. Executives, including Murphy and Stillwagon, plant superintendent, as well as Lewis, intervened, publicly at meetings of Acme Welfare or privately, urging employees into Acme and warning, threatening and discharging them for joining and leading U.A.W. Five U.A.W. officials were discharged in one week late in June for union activity, as the Board, on sufficient evidence, has found. Lewis had his then protégé, Sharpe, redouble efforts to line up toolmen for Acme. The company's opposition covered the entire plant and all employees except buffers and polishers. Its anti-C.I.O. campaign continued with increasing vigor during June, July, August and September, throughout the plant, but became less obvious in the toolroom from July 15 to August 6.

Sensing the failure of Acme Welfare to accomplish its purpose, about July 1 the company decided to reorganize it. Shortly before July 15, Lewis asked Sharpe to sign up the toolroom for a new association, saying, "We are going to reorganize the organization." Fouts knew of the intended reorganization before Sharpe did, and at a time when he, Byroad, Shock and others were beginning to talk I.A.M. It did not materialize. Byroad, Fouts and Shock began discussing A.F.L. for the toolroom about the middle of July. At the same time Lewis resigned as Acme Welfare's president at Westlund's command, the company having discovered finally that it was a company union. From then on Acme Welfare faded out of the picture as a labor organization.[18] At the end of July, just as I.A.M. was becoming successful in organizing the toolroom, the company refused to sign a collective bargaining contract with Acme, because, according to Lewis, it was tendered with the suddenly "offensive" argument that it would keep C.I.O. out.

Contemporaneously with the "fade-out" of Acme Welfare during the latter part of July, I.A.M. faded in, through the efforts of Byroad, Fouts, Shock, etc., in the toolroom. Following this success, Production Lodge No. 1200, I.A.M., entered the lists early in August to contest with U.A.W. for representation of production employees. Fouts, Shock, Byroad and Baker, aided by Bolander and Dininger, actively organized the toolroom and I.A.M. Lodge No. 35, soliciting on company time and property, taking the strange straw vote,[19] making contact with McDonald, A.F.L. organizer, conducting and concluding negotiations with the management for the closed-shop contract. Byroad's reported 80 per cent majority for I.A.M. on the straw survey turned out to be 34 signers out of 63 eligible when the organization meeting was held July 28. The thirty-four included the active organizers.

With this alleged majority, Shock, Fouts, Byroad and Bolander, accompanied by McCoy and one Keil, as well as McDonald, opened negotiations with Westlund and Murphy on August 3. The proposed contract contained provisions for a 40-hour week, wages (not finally specified in detail until August 11), and a closed shop. Despite Murphy's frequently expressed hostility toward "outside" unions and his consistent refusal before and after this time to recognize a C.I.O. affiliate as a bargaining agency, Shock, supported by McCoy, "convinced" him in a single conference lasting for an hour and a half to two hours that he should accept the closed shop and blank wage provisions. He asked for a 44-hour week, was assured there would be little trouble about that, and reserved the right to submit the contract to Serrick,

---

[17] This agreement was not involved in this proceeding, being questioned by none of the parties.

[18] Except for tender of the collective bargaining contract the last of July, the association reverted to its former status of a purely "social" and "welfare" organization. In September it was incorporated, the corporation taking over its assets and functions from which the charter specifically excluded activity as a labor union.

[19] Byroad conducted this, allegedly going from man to man, asking his preference between A.F.L. and C.I.O., recording the "votes" by tally mark on his sheet of paper. In view of the final alignment, it is unbelievable that 80% of the toolroom men indicated preference for A.F.L., as Byroad broadcast through the room, unless many of them did so with knowledge or suspicion of his relation to the management and fear of the consequences of any other answer.

the company's president, in New York. On August 6 Serrick approved the contract, except for insisting on a 44-hour week, upon its first submission by Murphy. The latter telegraphed the news to Westlund, who communicated it to Shock. He passed it on at an I.A.M. meeting on the evening of August 6, which voted to accept the 44-hour week. The next morning Westlund was notified of the vote. On August 8 or 9 I.A.M. issued a charter to the toolroom local.

Meanwhile U.A.W. had continued organization and had secured a large majority of the production workers. On August 10, Clark, a U.A.W. organizer, and Collins, an employee, conferred with Westlund, Lewis and Stillwagon, demanding recognition for U.A.W. as bargaining agency for the plant including the toolroom, but excluding buffers and polishers. Westlund says that following the conference he notified Murphy of it by telephone. Significantly or otherwise, the I.A.M. closed-shop contract for the toolroom was signed on August 11 and antedated to August 6. Toolroom employees were notified, and on August 13 more than 20, perhaps 25, who refused to join I.A.M., were discharged. A few others then or later joined I.A.M. to preserve their jobs or secure reinstatement. On August 14 the company amended its contract with A.F.L. Local No. 453, Buffers and Polishers, to provide for a closed shop.

■ In contrast with the precipitate execution of these contracts are the negotiations with U.A.W.[20] On August 10 U.A.W. representatives were put off with inconclusive answers and indefinite arrangements for a subsequent conference. On August 15, after signing closed-shop contracts with two A.F.L. affiliates within the four previous days, Murphy distributed among all the employees a violently phrased circular[21] attacking C.I.O. and U.A.W., without specific mention of their names. Feeling began to "run high" and threats of a strike appeared. Apparently at the instance of Fox, State Labor Board Mediator, Murphy and Westlund conferred on August 17 with Clark, U.A.W. president,

and Davis, local representative, regarding the discharge of U.A.W. toolmen, a proposed agreement for compensation to them for their dismissal practically without notice, and recognition of U.A.W. as bargaining agency for production workers. The results of the conference again were inconclusive. At another on August 19 Murphy is said to have reported that Serrick "gave him hell" for agreeing to the proposed compensation for discharged toolmen, and also that Serrick would recognize U.A.W. only as representative for its members. This conference also came to naught.

Between August 17 and 20 a field examiner for the Board attempted to bring about a settlement and secured the consent of U.A.W. and I.A.M. to an election among production workers. Murphy refused to agree, demanding separate elections for what he called the John Lees "division" and the Acme "division." U.A.W. agreed to this, but I.A.M. declined. Obviously, here Murphy was following the policy of "divide and conquer," as he had done in the toolroom and in amending the buffers' and polishers' contract on August 14. All attempts at settlement failing, U.A.W. called a strike on August 25. The plant was closed for two weeks. The corporation maintained its refusal to recognize U.A.W. Murphy questioned its majority, demanded a list of its members, which U.A.W. declined to give him, and rejected its counterproposal for comparison of its membership cards and the company's payroll by the regional director of the Board. This conduct may be contrasted with his, Serrick's and Westlund's unquestioning acceptance of McDonald's statement that he would furnish proof of I.A.M.'s majority in the toolroom, and their acceptance of the closed-shop provision before he did so.

On August 27 the company sued in the state court for an injunction against picketing. The trial judge secured a truce and the plant was reopened September 7. Subsequent conferences between U.A.W. and executives came to naught for inability to agree on wage rates and continued refusal of the company to recognize U.A.W. as exclusive bargaining agency.

---

[20] That comparison of speed in negotiating and contracting with contending unions is evidentiary in showing interference or assistance, at least when considered with other acts, see Hamilton-Brown Shoe Co. v. National Labor Relations Board, 1939, 8 Cir., 104 F.2d 49,

53; National Labor Relations Board v. National Motor Bearing Co., 1939, 9 Cir., 105 F.2d 652; Swift & Co. v. National Labor Relations Board, 1939, 10 Cir., 106 F.2d 87.

[21] See note 24, infra.

■ The final and conclusive evidence of the company's adamant purpose under no circumstances to recognize U.A.W. is found in the answer filed by it in this proceeding. Portions of it charged that C.I.O. (and U.A.W.) was engaged in a nation-wide illegal conspiracy to seize plants in various parts of the country, including the Muncie plant, under the guise of collective bargaining activity.[22] Properly stricken for the purpose of preventing introduction of testimony to sustain them, they cannot be stripped from the record as admissions of the company's fixed purpose. That was altered only by a change in the management which occurred after the hearing herein.

This mere recital of principal events discloses sufficiently the employer's determined purpose, never relaxed, to have nothing to do with U.A.W. and to use I.A.M. to keep U.A.W. out of the toolroom and the plant. The record is replete with evidence of other acts by executives and foremen which sustain this view.

Lewis warned, cajoled and threatened against the C.I.O. "invasion" and "outside" unions at Acme Welfare meetings and otherwise. In June or early July he told a meeting of Acme Welfare committeemen, "Boys, we don't want the C.I.O. in this plant. I know of a lot of things that is going on out in the plant, and * * * I have got a couple spotters up to the C.I.O. hall every meeting they have." To the association he said that C.I.O. was "merely a union coming into our plant to take over the management. We don't want nothing like that in here. If it gets in to this plant all your privileges will be taken away from you." At an association "beer party" for women, he put his feminine guests on record by taking a rising vote of "preference" between C.I.O. and Acme Welfare, after haranguing them against C.I.O. The result was almost unanimous for Acme. In July he asked Mona Armstrong to circulate an Acme solicitation paper among production workers. In August he told her, "If you had got those papers signed * * *, you would be still working." He warned Mrs. Kitchen, cafeteria employee, not to wear her C.I.O. button, saying that if Murphy or Westlund should see it, "they would feel bad about it * * * just like waving a red flag in front of a bull." He told Levi Benn, discharged from the toolroom on August 13, "Benn, I am sorry this happened. When this thing was first started it was only for a bluff and the fellows called the bluff and we had to go on and do it."[23] He advised Witmer and Sharpe in July to join I.A.M., in order to "have one organization" in the toolroom. His statement to Sharpe about having joined A.F.L. "because there is more money in it," may have been jocular, but in view of all these facts and their previous but then altered relations, Sharpe understood Lewis' intended meaning.

In addition to Murphy's activities, stated above, is Sharpe's undenied statement that Shock told him in July that he had known Murphy from boyhood, and that Murphy had said he would not recognize a C.I.O. union and would close the plant rather than deal with U.A.W.; that he (Murphy) hadn't had a vacation, would get on his yacht and take a nice fishing trip. This is confirmed by Murphy's statement to Clark between August 11 and 25, "Let them strike and get it out of their system * * * just call me up and I will close the plant down until we get it settled," followed by a similar statement to the chief of police. The most conclusive evidence of his attitude is found in the circular which he signed and distributed to all employees on August 15, four days and one, respectively, after signing closed-shop agreements with I.A.M. and the buffers' and polishers' union.[24]

---

22 Cf. note 24, infra.

23 Cf. note 28, infra.

24 The circular deprecated the displacement of the employees' "high moral [sic] and spirit of cooperation" by "a general feeling of dissatisfaction and unrest," and continued:

"We frankly believe this change has been brought about by the activities of outsiders. * * * It must be obvious that * * * continuance of * * * dissatisfaction will result inevitably in * * * loss of business to the company. * * * Should we be confronted with the necessity of making a choice between operating at a loss, or ceasing operations entirely, it would be definitely to the advantage of the company * * * to stop operations and * * * salvage * * * the assets * * * rather than * * * continue * * * unprofitable operations. It is our understanding strangers have come to you and have promised to secure for you certain increases in wages and other benefits. * * * We sincerely hope you will not be fooled by these promises. * * * You may be definitely assured we will not

**40**

Westlund, apparently, was close-mouthed, but he came with Murphy, Wise, Byroad, Fouts, Shock, etc., from John Lees Company, took part in the negotiations and conferences with I.A.M. and U.A.W.; supported Murphy unreservedly; angrily reproved Sharpe and Keil for not "ringing out" to discuss C.I.O. organization with him, and for continuing to discuss it afterward on company property with Clark, saying, "By ———, let them meet uptown." At his conference with U.A.W. representatives on August 10, his stenotype operator was present to take down what was said, a precaution not taken in any conference of executives with I.A.M. During a conference at his home in September he said he "did not think U.A.W. once they signed a contract would abide by it," and expressed a great preference for McDonald's attitude over Clark's.

Serrick agreed, apparently instantaneously, to the closed shop for I.A.M.; reproved Murphy in strong terms for consenting to a monetary settlement with the discharged toolmen, though he finally agreed under pressure to payment of two weeks' wages, which, however, never was made; refused at all times to recognize U.A.W. except to bargain for its own members. In line with these facts is Allison's testimony, denied by Shimer, night superintendent, of the latter's statement on July 26 that Serrick would recognize an A.F.L. organization, but not a C.I.O. one.[25]

The record contains equally abundant evidence of assistance to I.A.M. and obstruction to U.A.W. by foremen and minor supervisory officials, who reflected the attitudes and purpose of the management. A few instances are summarized in the margin.[26]

at this time, or at any time in the future enter into any agreement, written or verbal, with irresponsible organizations, or associations. There is no place in our picture for groups whose only method of securing desired results is by the use of lawlessness, violation of property rights, or violence of any kind, and we will not operate this plant, if any of these conditions prevail. * * * "

[25] Reference will be made to only one act of Stillwagon, general superintendent. He told Mary King, in view of her refusal to sign a card for Acme Welfare: "There wasn't any organization such as the C.I.O. going to tell them how to run the shop, they knew how to run it, and they didn't need any help; that it was just stubbornness * * * we would either sign or go home, but if we went home and refused to sign, they would have to take it up with the management as to whether or not we would work."

[26] Night Superintendent Shimer's statement that "the foremen don't like the C. I. O.," accompanied by the assertion that there was "going to be quite a lay-off" and that the C. I. O. would go first, made on July 26, two days before I. A. M.'s toolroom organization meeting, was borne out by the facts.

Warren Leet, production foreman, told Mona Armstrong about August 18 to take off her C. I. O. badge and join the A. F. L. Wright, characterized as "boss" of the cafeteria, told Bessie Price and Mrs. Kitchen to take off their C. I. O. buttons, and later discharged both for C. I. O. affiliation and activities. Pedlow, foreman in the handforming depart-

ment (production), said to Allred, who was discharged on August 25, "If you d—— fellows had sense enough to leave those badges [C. I. O.] off, the company would not be so hard on you." Earl Gregory, production foreman, asked Marjorie Stoker about August 1 if she belonged to any union yet, and said that of the two unions, "A. F. L. is best." Lynch, inspector and assistant foreman in the stenotype department, told John Hefley, "If we join the A. F. L. we get some place." Edward Griffin, production foreman of the third shift in the punch press department, told L. Collins, "If you will join the A. F. L. you can get ten cents more on the hour." Marvin Edwards, who acted as foreman for Gregory when he was away, engaged in general solicitation for A. F. L., and said to Jacob Gordon, "If you don't sign up in the A. F. L., there is liable to be a strike here by the C. I. O., and you are liable to lose three or four weeks' work." Truax, assistant night foreman in the bolt shop of the production department, made remarks antagonistic to C. I. O. beginning in May, 1937, solicited for Acme Welfare as late as the last of July, for A. F. L. in September even after the strike according to the testimony of several witnesses, and did not deny, when so charged by Joseph Conner, that he had been directed by the company to solicit for A. F. L. Lewis testified that Truax had the title of assistant foreman and supervisory functions.

Three witnesses testified without contradiction that in August immediately prior to the strike Theodore Fouts, assistant foreman in the handforming de-

The connection of the company with organization of the toolroom for I.A.M. is shown most clearly by the relations of the management to the principal organizers, Byroad, Shock, Fouts, Baker, Dininger and Bolander, and the nature of their activities in its behalf.

Fouts, frequently described as "assistant foreman" in charge of the roll department, worked under Murphy, Westlund, etc., with John Lees Company for twelve years. He solicited repeatedly for Acme Welfare, then shifted suddenly to active solicitation for A.F.L. Before Sharpe resigned as toolroom committeeman for Acme Welfare, Fouts had knowledge of Lewis' plan for reorganizing it. He reported to Lewis that he "didn't see how the hell we can sell the Welfare Association to the employees in the toolroom when the committeeman himself didn't believe in it." In soliciting Levi Benn to join A.F.L., he asked, according to Benn, "if I didn't think it would be my job if I didn't join." In the light of these facts Stevenson's statement that Fouts told him, in soliciting him first for Acme Welfare and later for I.A.M., that he wanted him to join "just in order to beat the C.I.O.," and that "if I would go in and didn't want to stay, that would be all right, just as long as they got in enough to beat them out, we could all help out," is not unworthy of belief.[27]

Shock was a principal organizer of I.A.M. and became its president. He worked for John Lees Company in Indianapolis for fourteen years before going to Muncie. According to Sharpe, he admitted having known Murphy "since I was a kid—from what he told me he absolutely would not recognize the C.I.O." Westlund acknowledged close acquaintance with Shock dating back more than ten years when they worked together for John Lees Company. Shock also solicited for Acme Welfare before he turned to I.A.M. He told Robert Bunch during the latter part of July, "Murphy made the statement that before the C.I.O. would come in there, they would shut down the plant." He denied saying at the conference with Murphy on August 3 (when Murphy consented to the closed shop) that so far as he was concerned "after that trouble was settled, why they could tear up the contract," and Murphy confirmed his denial. But Keil, who was present apparently at Murphy's invitation, testified directly that Shock made the statement, and the testimony of three other witnesses gives strong support to Keil's assertion.[28]

partment (production), solicited them to act as strikebreakers and assumed to speak on behalf of the management in offering them additional pay as well as board and other emoluments to remain in the plant twenty-four hours a day during the anticipated strike. He solicited each of them repeatedly, and others as well, to join A. F. L. and promised wage increases for doing so. His relation, if any, to Walter Fouts, organizer of I. A. M. in the toolroom, does not appear clearly from the record. If not brothers in blood, they were such in a common cause.

McCoy, foreman of the toolroom, was an old A. F. L. man, an employee of the John Lees Company at Indianapolis for at least twelve years, aided Sharpe in signing up Bolander as an Acme Welfare member late in June, "because he [Bolander] is not allowed to hire or fire," told Sharpe during the early part of July, "If the C. I. O. gets in here, this place will go to hell," permitted active and open solicitation in the shop by A. F. L. representatives, complained because "the A. F. L. members come and tell me what they are going to do, but the C. I. O. doesn't say anything."

27 Cf. note 28, infra.

28 Stevenson testified **that immediately** after the conference on August 3 Fouts told him that "the C. I. O. was not as strong as they thought. * * * The A. F. L. would beat them easily. * * * They said if I would get in * * * I could drop it as soon as the trouble was over with, as they was going to do it too." Maynard, U. A. W. committeeman, testified that on September 22 he asked Westlund whether the I. A. M. representatives in presenting the proposed contract had not asserted that "after they had gotten the contract and got the C. I. O. out of the plant, kept them out of the plant, they could just tear the contract up, they wouldn't need no union there," and Westlund replied, "Well, no, not in just that many words, but the statement was made." Lewis' statement to Benn on August 13 quoted in the text supra, note 23, that "it was only for a bluff" confirms the testimony of Stevenson and Maynard. Westlund, on direct examination, denied Keil's statement, but on cross-examination qualified the denial by saying he had no recollection of hearing C. I. O. mentioned. All this supports the statement of Benn, who belonged originally to U. A. W., was discharged on August 13, and later joined I. A. M., that Acme Welfare "later developed into I. A. M."

Again, the conflict in the evidence was for the Board to resolve.

Byroad has a history even more interesting than those of Fouts and Shock. He, too, worked for John Lees Company in Indianapolis, while Westlund, McCoy, and Wise, tool supervisor, were connected with the company, and with McCoy as far back as 1916. Whether he was employed continuously by the John Lees Company from that year until the plant was removed to Muncie does not appear. At any rate, he was employed there as early as 1928 and first went to Muncie on February 6, 1937. He remained only one week, leaving and not returning until early in July. Immediately on coming back he signed first an Acme Welfare card, then a C.I.O. card, but, to quote his own words, "gave them [C.I.O.] no money." According to Keil, Byroad also solicited for C.I.O. "when he first came in there, but he, for some reason or other, dropped the C.I.O. and became a sort of organizer for the A.F.L. affiliate." Within a few days after lining up with C.I.O., he discussed the situation with Shock, Fouts and Baker, and became, with the possible exception of Shock, the most active and vigorous solicitor for A.F.L., spending as much as 75 to 80 per cent of his time at this, according to some of the testimony. He not only solicited extensively and continuously on company time and in the toolroom, but collected dues at the bench where he worked. He threatened some employees, including Keil, with loss of their jobs if they did not sign up with A.F.L., cursed others for not doing so (Levi Benn), and told Sharpe: "Mac [McCoy] knows what I am doing. Mac is an old A.F.L. man himself. He wants us to get in the A.F.L., but he don't want us to have anything to do with the C.I.O." He took the so-called straw vote about July 20 and reported the alleged 80 per cent preference for I.A.M. His testimony on cross-examination concerning the contrast between the reported percentage and the majority of 34 which actually materialized was, to say the least, embarrassing. After conferring with Shock, Fouts and Baker, he was "delegated" to find an A.F.L. organizer and did so.

Byroad's peculiar relations with the management, the circumstances of his various arrivals and departures, and the nature of his activities raise the question whether he was a bona fide employee or actually an employer's representative in the guise of an employee. They call to mind forcibly Lewis' assertion that he had "a couple spotters up at C.I.O. at every meeting." Whether the statement was made before or after Byroad's July arrival, his part was consistent with such a function and with the management's evident willingness to have it performed. From the evidence the inference is permissible that he was brought in both for purposes of espionage upon C.I.O. and to organize the toolroom for I.A.M. He came just when Acme Welfare was breaking down. He went through the motions of lining up with it and solicited others to do so. Then he shifted, nominally, to C.I.O. Just as suddenly he shunted himself to I.A.M. All this occurred within three weeks. He remained steadfast to the last shift. He was the leader in organizing for I.A.M. and became its committeeman. He was given almost complete freedom to carry on his organizing activities on company time and property. McCoy's single and none too harsh reproof came lightly and late to his ears. When the task was completed he left the employment without apparent intention of returning and after negotiations which resulted in tender of another job at his old home in Indianapolis. He came back only after the hearing had begun and at Baker's solicitation. All this may be consistent with his exercising the rights of a free and independent laborer. On the other hand, the inference is not unreasonable or arbitrary that his activities in behalf of I.A.M. were the company's activities and constituted unfair labor practices.

Little further need be said concerning Bolander, Dininger and Baker. Bolander acted as foreman on the third shift, which worked at night, when McCoy was absent. He likewise worked for four years for John Lees Company before going to Muncie. He, too, joined Acme Welfare, at McCoy's instance when Sharpe solicited him. McCoy's statement that he (Bolander) "will sign right now because he is not allowed to hire and fire," shows McCoy's recognition of Bolander's status as foreman of the night shift in McCoy's absence, though it also shows that McCoy did not consider this to disqualify Bolander for membership. He permitted Wheeler to solicit and pass out A.F.L. blanks at the foreman's desk. Dininger also acted as night foreman in the toolroom, and according to McCoy's statement had power to "lay off" men, though apparently not to discharge them. He not only was ac-

tive in organizing and soliciting for I.A.M. but purported to speak for the management in promising employees good rating if they would join the A.F.L.

▆ In summary, Byroad, Shock, Fouts and Bolander combined in themselves the capacities of (1) old and trusted employees under Murphy, Westlund, Wise and McCoy at John Lees Company in Indianapolis; (2) active soliciting agents and promoters of Acme Welfare until it gave up the ghost; (3) principal organizers of the toolroom for I.A.M.; and (4), as will be shown, except for Byroad, minor supervisory officials of the company. Acme Welfare disappeared from the scene as a "labor" organization just as I.A.M. was entering through their efforts, though the conflict of the management with U.A.W. continued with rising bitterness. Contemporaneously with this change the former John Lees executives took over from Lewis, who came from Acme Products Corporation, the direction of important labor policies and negotiations. With Lewis' eclipse, Sharpe, his boyhood friend, sickened of his servile role and refused to continue in it for the new authority. But for Byroad, Shock, Fouts and Bolander no such transfer of loyalties was required. Acme Welfare was a company union. It follows necessarily that its leading promoters were company representatives. Men accustomed to such submission seldom regain independence overnight. The interval, if there was one, required for the transfer of allegiance by Byroad, Fouts, Shock and Bolander from Acme Welfare and the company to I.A.M. was too brief for disruption of the old and basic loyalty. The evidence supports the conclusion that it was not disrupted, but continued, though manifested in less obvious but more effective form. All that they did, therefore, is imputable to the company. Without their efforts no majority for I.A.M., nominal, assisted or otherwise, would have been created on July 28 or at any other time prior to August 11. With them, the majority was not freely and independently created.

Their relations to the management also give substance to the view that they had actual, though not officially nominal, supervisory capacity.[29] Fouts was regarded by the workers as assistant foreman. Dininger had authority to "lay off" men, according to McCoy, and he and Bolander discharged the duties of foreman in night shifts. Shock acted for McCoy in the day shift, when he was absent. Fouts, Bolander and Dininger had authority to make recommendations to the management concerning quality and performance of work by men working under them.[30] McCoy himself had little, if any, further power. According to all of the evidence, "hiring and firing" was the function primarily of Lewis, more rarely of his superiors. A suggestion for employment or discharge by foremen and subforemen so closely connected with the management is as potent, practically, as the power to "hire and fire."

VII. A further word is required concerning the antedating of the contract. Throughout negotiations a written contract was contemplated. The schedule of wages was not settled finally until August 11. I.A.M. had no charter prior to August 8 or 9, hence could make no official contract until that time. The vote taken August 6 to accept Serrick's condition of the 44-hour week was not communicated to the company until August 7. On that day, Byroad with Westlund's acquiescence announced that the company would sign a closed-shop contract when Murphy returned. The contract specifically provides that it shall be effective from the time of execution. Yet when it was signed on August 11, it was antedated to August 6. It is contended that this was done because the agreement really was made on that day. However, U.A.W.'s demand for recognition was made on August 10. The inference is equally permissible that the motive was to circumvent this demand, despite denials by Murphy and Westlund, who negotiated with both unions.

▆ The practice of antedating contracts may be legitimate or otherwise according to varying circumstances. Whatever its effect between the parties, rights of third parties should not be affected adversely, particularly when they involve interests so important and controversial as collective bargaining and the closed shop. To stamp with judicial approval a practice so questionable would invite evasion of the statute's intended protections. The question is important in relation to assistance rendered by the employer during the interval covered by the antedating. The prac-

---

[29] See note 32, infra.

[30] Lewis told Collins that assistant foremen who acted in the absence of foremen "recommend to hire and fire."

tice cannot legalize retroactively discharges and other aid given at a time when no contract actually exists. Whether or not an employer legally can assist a union having a closed-shop contract, his aid given when none exists is unlawful. Such a contract involves consequences for minorities far more serious than one for collective bargaining. These considerations make the practice of antedating inappropriate to a fair and proper administration of the statute.

 In our view, therefore, the contract did not take effect prior to August 11. It follows that assistance given I.A.M. between that date and August 6 was unlawful. With the company's acquiescence, a general, though informal, announcement was made (by Byroad) on August 7 that the company would sign such a contract when Murphy returned. This put the company openly on the side of I.A.M. It constituted a threat to the job of every non-member of I.A.M. in the toolroom. Byroad took full advantage of the threat in vigorous solicitation between August 6 and August 11. Without doubt the threat helped to keep the tenuous majority in line, if not to increase it. In its zeal to be rid of U.A.W., the management overreached itself. Permitting the premature announcement gave prohibited aid and comfort to I.A.M. The consequences of its haste cannot be overcome by the artifice employed.

 VIII. We think therefore that the evidence fully sustains the findings of the Board that the employer unlawfully assisted I.A.M. to organize the toolroom and secure the closed-shop contract. The evidence is open to two possible inferences.

Either the toolroom was entirely unaffected by the controversy which raged all about it, or it was in the very center of that conflict; either the toolroom employees were free from the pressure and intimidation, openly and constantly applied by the chief executive officers elsewhere throughout the plant, or they were its victims as were all others; either Byroad, Fouts, Shock, et al. suddenly recovered their independence after serving the management as far as they could in the company union, or their subservience continued when they turned to I.A.M. Only by ignoring all that occurred in the plant from May to October except what took place in the toolroom between July 28 and August 6 is the one set of inferences possible, and then only questionably so. Such limitation of judicial vision would eliminate the most revealing and convincing evidence in the record. It may be permissible for an employer merely to express a preference between two unions otherwise contending freely for position as bargaining representative, although this has obvious dangers and limitations and the final authority has not so held.[31] But he cannot go further and lend a hand, openly or covertly, to one of the contestants. The basic policy of the Act is "hands off" so far as he is concerned. The statute, we think purposely, does not define the particular methods or agents by which the employer may intermeddle unlawfully. Had it done so, easy escape would have been opened from the Act's provisions. Nothing in it requires that such representation be limited to officials having any particular kind or degree of authority, such as "hiring and firing," "disciplinary power" or even "supervisory capacity."[32] These evidences of

[31] It is to be emphasized that in Consolidated Edison Co. v. National Labor Relations Board, 1938, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126, the Supreme Court merely assumed, for purposes of discussing and refuting an argument of counsel, that it would not be an unfair labor practice for the employer merely to express a preference between two independent labor organizations seeking recognition. The language of the court (305 U.S. at page 230, 59 S.Ct. at page 217, 83 L.Ed. 126), referring to a statement made by an executive of the company at a meeting of employees that they were absolutely free to join any labor organization, was:

"Despite this statement and assuming, as counsel for the companies urges, that where two independent labor organizations seek recognition it cannot be said to be an unfair labor practice for the employer merely to express preference of one organization over the other, by reason of the former's announced policies, in the absence of any attempts at intimidation or coercion, we think that there was still substantial evidence that such attempts were made in this case."

[32] That employees performing supervisory duties, but having no power to "hire and fire," represent the employer when they engage in conduct amounting to unfair practices is established by Zenite Metal Corp., 1938, 5 N.L.R.B. 509, 515, 516, 518, enforced, National Labor Relations Board v. Zenite Metal Corp., 1938, 7 Cir., 102 F.2d 1006, and by numerous decisions of the Board, including Semet-Solvay Co., 1938, 7 N.L.

authority make more plain the connection of the actor with the employer, but their absence does not preclude the existence of such a connection. What is required is that substantial evidence show that the actor, whatever his official position, is acting in fact on behalf of the employer, not for himself or others only, and that, by whatever methods or means, the employer brings pressure to bear upon his employees which deprives them of free and independent choice. We think the evidence here sustains the Board in finding that the active organizers, Fouts, Shock, Bolander, et al., had supervisory capacity, but independently of that it also sustains the ultimate finding that they acted for and on behalf of the employer. Here there was much more than mere expression of preference. There were violent hostility and sustained obstruction toward the one, precipitate and consistent though (as was inevitable) in-

eptly concealed, aid and comfort to the other. The Board preferred to look at the whole picture, not merely a single detail. In doing so it did not act arbitrarily.

IX. It follows from what has been said that the Board did not find arbitrarily that the toolroom was not an appropriate unit. In the circumstances prevailing, the unit was subjected to the same unlawful pressures as deprived the union of its capacity for representation and the closed-shop contract of validity. That fact was proper for the Board to consider in determining whether to apply its own so-called "Globe doctrine." [33] Whether or not the existence of such pressures of its own force vitiated the unit, it deprived the Board's refusal to apply the "Globe doctrine" of any element of arbitrary character. That was peculiarly true here, in view of the fact that the employer's assistance not only aided the union before the

R.B. 511, 520, and Mount Vernon Car Mfg. Co., 1939, 11 N.L.R.B. 500. In Hamilton-Brown Shoe Co. v. National Labor Relations Board, 1939, 8 Cir., 104 F.2d 49, the court sustained the Board in attributing to the employer the acts of an officious citizen of the town, not connected, openly at any rate, by employment with the company, on finding acquiescence in and support of his conduct through the subsequent activity of supervisory employees, who, in turn, were not shown clearly to have the power to hire and fire. See the Board's opinion, 1938, 9 N.L.R.B. 1073. In Virginia Ferry Corp. v. National Labor Relations Board, 1939, 4 Cir., 101 F.2d 103, the court held the employer responsible for statements of its ship's captain, despite the fact that, so far as could be ascertained from the Board's findings, he did not have the power to hire and fire. In Swift & Co. v. National Labor Relations Board, 1939, 10 Cir., 106 F.2d 87, 93, where it does not appear from either the court's opinion or the opinion of the Board [1938, 7 N.L.R.B. 269] that the "supervisory foremen" had the power to hire and fire, the court said, "Furthermore, with respect to the acts of the supervisory foremen, the doctrine of respondeat superior applies, and petitioner is responsible for the actions of its supervisory foremen, even though it had no actual participation therein." The court held that the employer under such circumstances is charged with an affirmative duty to prevent his foremen from aiding in union organization. See also, Consolidated Edison Co. v. National Labor Re-

lations Board, 1938, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126, where the evidence of employer interference and coercion was held to be sufficient, although much of this interference was by "supervisory employees" who were not shown by the Board's findings [1937, 4 N.L.R.B. 71] to have power to hire and fire. The view taken, apparently, in Ballston-Stillwater Knitting Co. v. National Labor Relations Board, 1938, 2 Cir., 98 F.2d 758, that the employee must have authority to hire and discharge in order to charge the employer with his acts appears to be contrary to the authorities cited above, and, for the reasons stated, cannot be approved.

When other evidence of the actor's agency for the employer is lacking, "supervisory" or "disciplinary" authority supplies it. But lack of such authority only makes it necessary to show the agency in other ways. It does not negative the possibility that the agency may exist.

[33] The doctrine takes its name from Matter of Globe Machine & Stamping Co., 1937, 3 N.L.R.B. 294. Briefly stated, it is to the effect that where the circumstances are such that the Board reasonably could conclude that either the craft or the plant unit would be appropriate for collective bargaining purposes and where either contention if unopposed would be adopted by the Board, it normally gives paramount weight to the wishes of the employees within the craft unit. Cf. Third Annual Report of the National Labor Relations Board (1938), pp. 167–174.

contract "was made," [34] but created the majority for I.A.M. on which its claim to a separate unit in the toolroom was founded.

 Independently of assistance from the employer, there was evidence sufficient to sustain the Board's decision concerning the unit. Although refusal to apply the "Globe doctrine" was based in part on such assistance, two other reasons were assigned, one of which was the existence of a substantial U.A.W. minority in the toolroom. Under the statute the Board is empowered in general terms to designate an "employer unit, craft unit, plant unit or subdivision thereof." [35] That employees in a particular craft or subdivision may be more highly skilled and paid than others is merely one fact which the Board may consider with others, not a criterion. If it is disconnected in function, physical location and human associations from other departments, those facts point toward application of the doctrine. On the other hand, close integration in these respects with the remainder of the plant may indicate an opposite conclusion. The effect of designating the proposed unit upon the bargaining rights of employees in other parts of the plant is material, as is the extent to which sentiment within the unit proposed is preponderant in favor of one or another type of unit and union.[36] Here toolroom men were generally more highly skilled and paid. But their work, location and associations dovetailed closely with the production department. A large majority of production workers favored U.A.W. I.A.M.'s majority in the toolroom was small and tenuous. Under these conditions it was peculiarly a matter of administrative discretion whether the interests of all employees would be served best by designating a single unit composed of all or by setting the toolroom off as a separate unit. The decision in such circumstances is a delicate one and has been delegated by Congress to the Board. With propriety and without regard to the employer's activities it could be made with reason either way. That being so, the Board did not act arbitrarily and the courts should not interfere with its decision.

The order of the Board is affirmed.

GRONER, C. J. (dissenting).

I am unable to agree in so much of the decision as affirms the order of the Board holding invalid the closed shop contract covering the tool room workers. The opinion, as I think, spends itself upon the effort to establish the hostility of Serrick Corporation to United Automobile Workers of America (U.A.W.). Concededly, hostility existed and justified the Board's findings of unfair labor practices in the employer's efforts to sustain its old company union, but it had nothing to do with the controversy involved on this appeal. In this view, the opinion overlooks the single vital issue we have to determine— the issue involving the respective rights of two rival labor organizations whose existence is independent of the employer. For that reason, I am not concerned with the attitude of Serrick Corporation to U. A.W. The employer is not a party to this appeal. It has accepted the Board's ruling, and even before that, had abandoned support of the company union as a collective bargaining agency. Nothing that it did thereafter is shown either directly or impliedly to have had any relation to the tool room controversy. The right of International Association of Machinists (I.A.M.) Lodge 35 to represent the tool

---

[34] The statute specifically requires that the unit be appropriate at the time when the closed-shop agreement is made. 29 U.S.C.A. § 158(3). As has been indicated, the effective date here was August 11, not August 6.

[35] 29 U.S.C.A. § 159(b).

[36] Assuming that Congress intended the Board's decision concerning appropriateness of the unit to be reviewable, as are its findings of fact, the review can go only to the question whether the decision is arbitrary, National Labor Relations Board v. Carlisle Lumber Co., 1937, 9 Cir., 94 F.2d 138; National Labor Relations Board v. Lund, 1939, 8 Cir., 103 F.2d 815, not to a weighing of "the equities" or a balancing of conveniences.

The language of the court, speaking through Judge Thomas, in the latter case is pertinent: "Obviously all these provisions of the Act place a broad power of discretion, though not one that may be exercised arbitrarily, in the Board for the designation of an appropriate bargaining unit. * * * The question of appropriateness depends upon other factors such as unity of interest, common control, dependent operation, sameness in character of work and unity of labor relations. There may be others; but, unless the finding of the Board is clearly arbitrary upon the point, the court is bound by its finding." 103 F.2d at p. 819.

room workers was fixed before the date of its contract. A majority of this particular craft had exercised their rights under the Act to choose their representative, and this right was not challenged by the filing of the original complaint. Only by subsequent amendment was it brought into the proceedings. The Board has taken punitive action against this labor organization and its members, as to whom nothing has been charged or shown violative of the Act. The decision rests on the finding that, because the corporation had shown great hostility to U.A.W. in a contest to enroll its *production* force, and later had acquiesced without protest in the organization by I.A.M. of the tool room force, a separate unit, it had unfairly assisted the latter in enrolling its majority. The condemned assistance is shown to be the activity of some of the tool room men, who are called supervisory employees.

If the question turned upon the weight to be given to the evidence, I should, of course, without hesitation acquiesce in the Board's decision. But since the Board, in my opinion, has erroneously decided a question of law, the rule which binds me to accept its findings has no bearing.

The unfair labor practive found by the Board concerns the activities of six tool room employees: Fouts, Shock, Byroad, Bolander, Baker, and Dininger; and the responsibility of the employer for their acts is, as I have said, placed upon the Board's conclusion that they were supervisory employees and as such should be regarded as acting for the employer. Except for this definite finding, it is obvious the Board would have followed the recommendation of its examiner. But the admitted fact is that all of the above named employees were tool room workers and not "supervisory" in any sense which would make their organizational activities attributable to the employer. This is vouched by a stipulation filed in the record which the examiner and all of counsel considered as binding until its effect was for the first time challenged by the Board's decision.[1]

The findings, both of the examiner and of the Board, show that in the spring of 1937 one of the C.I.O.-affiliated unions (U.A.W.) began an intensive campaign to enroll members in the *production department* of the plant of Serrick Corporation. When this activity was at its height, the tool room employees, who compose a separate group of skilled machinists and receive higher wages, and whose working quarters are separated from the production department of the plant—and who are recognized in the industry as a separate unit—and so recognized by the Board,[2]— determined to join a union of their own choosing.

A majority preference for I.A.M. having been determined on July 28, 1937, a meeting with an outside organizer was held, and 34 of the 63 employees of the tool room signed application cards, paid their dues, and obtained a charter. And within a few days thereafter their representative signed a closed shop contract with the employer. The Board's examiner, who heard all of the evidence, found that the impetus to the organization under the auspices of I.A.M. came from the unwillingness of the majority to go along with U.A.W., and this unwillingness, he concluded, though agreeable to the corporation, was not inspired by any action on its part. On this basis he recommended that the contract dated August 6, 1937, should be held in all respects valid.

[1] "Comes now The Serrick Corporation, respondent, by White & Haymond, its attorneys, The National Labor Relations Board by Colonel O. Sawyer, regional attorney for said Board, The International Union United Automobile Workers of America, Local No. 459, by Paul Brady, its attorney, and O. F. McDonald, representing the International Association of Machinists, affiliated with the American Federation of Labor, and stipulate the following facts, to wit:

That the following list of names includes all the employees of The Serrick Corporation at its Muncie Plant * * * *with the* * * * *exception of foremen, office employees and other supervisory employees* which were on the pay roll, which pay roll included the date of July 9, 1937 * * *" (Italics supplied.)

Among the names of employees other than supervisory employees appear the names of Fouts, Shock, Byroad, Bolander, Baker, and Dininger.

[2] This statement is conceded in the Board's findings as follows:

"While ordinarily we have regarded as controlling the free choice of a majority of the employees in a well-defined craft as to the form of organization they desire, in the present case the respondent's conduct in influencing such choice precludes the application of this doctrine in the determination of the appropriate unit or units."

The Board set aside this recommendation, notwithstanding the statute itself preserves a closed shop contract made with representatives of the majority. 29 U.S.C.A. § 158(3). It took this action on the ground that the corporation had influenced the choice of the men. Except for a reference, too trivial to notice,[3] to two minor company officials—Shimer and Lewis—this charge is based upon acts of the workers themselves. True enough, the organizers were trusted employees of long standing, and because of their skill had greater responsibility than the newer men in the technical work of the tool room. But aside from this they were ordinary employees. Nothing in the evidence shows that they acted in such a supervisory capacity as to make their organization of the I.A.M. Lodge 35 attributable to their employer. See National Labor Relations Board v. A. S. Abell Co., 4 Cir., 97 F.2d 951. Their apparent loyalty to the old company union, while it existed, of which much is said in the opinion, is nowhere shown to have been "servile". Nor is there anywhere evidence, entitled to be dignified as substantial, that after realization that the old order was to be succeeded by the new, they were influenced by anything other than their own free will in choosing the labor organization to which they would belong. Their mistaken classification by the Board as "supervisory employees" is an obvious recognition of this fact, for as I have shown, it was on this ground, namely that they represented and spoke officially for the employer, that the Board based its ruling dissolving their contract.

The opinion of the court appears to be largely influenced by the impression that the admitted hostility of the employer to the unionization of its plant by U.A.W. justifies the inference that the employer inspired and intended to inspire the tool room men to organize separately. This fancied strategy the opinion speaks of as the "policy of 'divide and conquer'," but the record does not sustain this inference, and even if it did, such partiality, without more, never has been and never ought to be held an unfair labor practice. Cf. Jefferson Electric Co. v. National Labor Relations Board, 7 Cir., 102 F.2d 949, 957. If the rule were otherwise, it would afford the employer an easy method to control employee representation by simulated preference. The case we have does not turn upon any of these conditions, but rather upon the authority of Fouts and his companions to speak for the employer. If they were not authorized, then obviously their activities cannot be labeled employer activities. If the Board's classification of these men is wrong, the ruling cannot be sustained. I think the decision as to the tool room contract should be set aside.

---

[3] Cf. National Labor Relations Board v. Sands Mfg. Co., 306 U.S. 332, 342, 59 S.Ct. 508, 63 L.Ed. 682.