## SWIFT & CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 1720.

Circuit Court of Appeals, Tenth Circuit.

June 7, 1939.

Rehearing Denied Aug. 4, 1939.

Montgomery Dorsey, of Denver, Colo. (Wm. N. Strack, of Chicago, Ill., and Hughes & Dorsey, of Denver, Colo., on the briefs), for petitioner.

Ernest A. Gross, of Washington, D. C. (Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Mortimer B. Wolf, and Allen Heald, Attys. for National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before PHILLIPS, BRATTON, and WILLIAMS, Circuit Judges.

PHILLIPS, Circuit Judge.

This is a petition of Swift & Company[1] to review an order of the National Labor Relations Board.[2] The petitioner is an Illinois corporation, and is engaged in the business of purchasing and slaughtering livestock and preparing for market and marketing meat products. It operates a packing plant at Denver, Colorado, and sells a substantial portion of the products of its Colorado plant in interstate and foreign commerce.

Amalgamated Meat Cutters and Butcher Workmen of North America, Local No. 641,[3] is a labor organization affiliated with the American Federation of Labor. United Packing House Workers Local Industrial Union No. 300[4] is a labor organization affiliated with the Committee for Industrial Organization. Each admits to membership production employees in the meat packing industry throughout the state of Colorado, including workers at petitioner's Denver plant.

Packing House Workers Security League[5] is an independent labor organization drawing its membership from the employees of petitioner at its Denver plant.

For many years prior to April 20, 1937, there had existed at petitioner's Denver plant an organization known as the Assembly Plan.[6] The Plan provided for the selection of eight employee representatives, chosen by the employees in the various departments at elections supervised by the petitioner, and eight representatives designated by the management of petitioner. These representatives met at regular intervals during working hours in the petitioner's office building. They heard labor grievances and complaints, discussed and made disposition thereof. During the existence of the Plan, approximately 75 per cent of the complaints and requests were disposed of favorably to the employees.

On April 20, 1937, a special meeting of the representatives was called at the Denver plant on orders of Middaugh, the plant manager. The sole purpose of the meeting was to inform the representatives that it was necessary to dissolve the Plan due to the decisions of the United States Supreme Court on April 12, 1937, in the National Labor Relations Board Cases.

The Plan was dissolved. Thereafter, the League was organized and drives for membership were carried on by the League and the Amalgamated. In July following, the United commenced a drive for membership.

On May 7, 1937, a committee of the Amalgamated called on Middaugh and stated that its membership embraced a majority of petitioner's employees and asked for exclusive designation as collective bargaining representative. This demand was repeated on May 17. Middaugh was not satisfied that the Amalgamated represented the majority of the employees. On May 25 the League demanded recognition as the sole bargaining agency and furnished satisfactory proof that its membership included over 70 per cent of petitioner's employees. Recognition was thereupon granted to the League as the sole bargaining agency.

Thereafter, upon charges filed by the

---

[1] Hereinafter referred to as petitioner.

[2] Hereinafter referred to as the Board.

[3] Hereinafter referred to as the Amalgamated.

[4] Hereinafter referred to as the United.

[5] Hereinafter referred to as the League.

[6] Hereinafter referred to as the Plan.

Amalgamated and the United, the Board, by George O. Pratt, Regional Director for the 17th Region, on September 15, 1937, issued a complaint against petitioner, charging that it had engaged and was engaging in unfair practices affecting commerce within the meaning of Section 8, subdivisions 1 and 2, and Section 2, subdivisions 6 and 7, of the National Labor Relations Act, 29 U.S.C.A. §§ 158(1, 2), 152(6, 7).

The complaint, omitting the allegations respecting the business in which petitioner is engaged and the character of commerce in which it engages, which are not controverted, alleged that petitioner by its officers and agents from on or about April 20, 1937, to September 15, 1937, urged, threatened, and persuaded its employees to organize and participate in the formation, operation, and administration of the League, and gave aid and support to the League:

"(a) In that the respondent [petitioner] did encourage, allow and permit supervisory employees and other employees acting in the interest of the respondent [petitioner] to organize, promote and encourage membership in the 'Packing House Workers Security League' on the respondent's [petitioner's] time and on the respondent's [petitioner's] property and while in the respondent's [petitioner's] pay and at its expense.

"(b) In that the respondent [petitioner], by its officers and agents and other employees acting in the interest of the respondent [petitioner], by threats, actual or implied, of discharge, demotion, loss of bonuses, or loss of seniority and other rights and privileges, and by the lay off for short intervals and the subsequent demotion of certain employees because of their refusal to join the 'Packing House Workers Security League,' did intimidate and coerce employees for the purpose of compelling their participation in the formation, operation, and administration of the 'Packing House Workers Security League.'"

It further charged that by such acts petitioner dominated and interfered with the formation and administration of a labor organization, and interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed by Section 7 of the National Labor Relations Act, 29 U.S.C.A. § 157, and thereby engaged in unfair labor practices within the meaning of such Act.

A copy of the complaint, accompanied by notice of hearing to be held on September 27, 1937, at Denver, Colorado, was served on petitioner on September 16, 1937. On September 21, 1937, petitioner filed its answer in which it denied all the material allegations of the complaint. On the same day the petitioner filed a motion in which it set up that the charges failed to state with sufficient particularity the facts constituting the alleged unfair labor practices to enable petitioner to properly prepare its defense and prayed that the charges be made more definite and specific.

A hearing was held before a trial examiner at Denver on September 27, 28, 29, and 30, and October 4, 5, 6, and 7, 1937. At the commencement of the hearing petitioner moved that the complaint be made more specific in order to enable it to prepare for the hearing. The examiner denied the motion. The Board completed its proof during the afternoon of September 30, 1937. Thereupon, the petitioner requested a reasonable time within which to prepare for the cross-examination of certain of the Board's witnesses and to prepare for the presentation of its own evidence. The motion was denied, but the hearing was adjourned from Thursday afternoon until Monday morning. On Monday morning, October 4, 1937, petitioner again renewed its motion that it be granted a reasonable time within which to prepare for the presentation of its evidence. The motion was denied. Petitioner then proceeded with the cross-examination of certain of the Board's witnesses not theretofore cross-examined and with the introduction of its own evidence.

Both at the close of the Board's evidence and at the close of the hearing, petitioner moved to dismiss the charges on the ground that they were not supported by substantial evidence. These motions were denied.

The examiner filed his intermediate report and petitioner filed exceptions thereto. The cause was orally argued before the Board. It handed down its decision on May 20, 1938.

Section 10(b) of the National Labor Relations Act, 49 Stat. 453, 29 U.S.C.A. § 160(b) in part reads as follows:

"Whenever it is charged that any person has engaged in or is engaging in any

such unfair labor practice, the Board, or any agent or agency designated by the Board for such purposes, shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect, and containing a notice of hearing before the Board or a member thereof, or before a designated agent or agency, at a place therein fixed, not less than five days after the serving of said complaint. * * *"

Section 4(c) of Article II of the Rules and Regulations of the Board (Series 1, as amended) reads as follows:

"Section 4. Such charge shall contain the following:

"(c) A clear and concise statement of the facts constituting the alleged unfair labor practice affecting commerce, particularly stating the names of the individuals involved and the time and place of occurrence."

The complaint here was couched in general language. It did not state the names of the individuals involved nor the time and place of the occurrences. Its form is not to be commended. Rather, it is to be disapproved. There were about thirty-five foremen employed at the Denver plant and approximately 750 employees. No doubt, the lack of particularity made it difficult for the petitioner to meet the charges. However, at the close of the Board's evidence, petitioner was fully advised of the times and places of the alleged unfair labor practices and of the persons involved, and it was given two days, excluding Sunday, to prepare for the cross-examination of certain of the Board's witnesses and the presentation of its own evidence. Counsel for the petitioner fully cross-examined the Board's witnesses and introduced evidence of its plant manager, plant superintendent, supervisory foremen, and employees on each of the charges made and the issues presented. We are not convinced that it was prejudiced by the lack of particularity in the complaint.[7] Furthermore, if, after the conclusion of the hearing, petitioner discovered other evidence bearing on the is-sues which it failed to introduce because of the lack of particularity in the complaint and the time afforded for preparation for the hearing, it could have applied to this court under Section 10(e) of the Act for leave to adduce such additional evidence. It has not availed itself of that remedy.[8]

Section 7 of the Act provides:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."

Section 8 of the Act in part reads:

"It shall be an unfair labor practice for an employer—(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [157 of this title]. (2) To dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it."

The manifest purpose of the Act is to prevent unfair labor practices affecting commerce, to the end that industrial peace be promoted, labor controversies settled through the processes of reason and conciliation, and interstate commerce not injuriously affected by industrial strife.[9]

Middaugh, the plant manager, and Young, the plant superintendent, promptly after the decision of the Supreme Court in the National Labor Board cases, took effective steps to bring about an immediate dissolution of the Plan and by written notice and oral communications repeatedly advised the supervisory foremen and petitioner's employees that the provisions of the National Labor Relations Act, 29 U.S. C.A. § 151 et seq., would have to be complied with and that solicitation of membership in labor organizations would not be permitted on petitioner's premises during working hours.

Section 10(e) of the Act provides that "The findings of the Board as to the facts,

[7] National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, 873.

[8] See Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 226, 59 S.Ct. 206, 83 L.Ed. 126.

[9] National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 41, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Black Diamond S. S. Corp. v. National Labor Relations Board, 2 Cir., 94 F.2d 875, 878, 879.

if supported by evidence, shall be conclusive."[10]

The Board introduced substantial evidence of these facts:

The employee representatives of the Plan, immediately after its dissolution, launched the formation of the League. Solicitation for membership in the League, the United, and the Amalgamated took place on petitioner's premises during working hours. The supervisory foremen of petitioner not only countenanced but aided and encouraged such solicitation in the League. The petitioner's managing officers took no effective means to stop such solicitation when the facts were called to their attention, other than to repeat the warnings theretofore made.

Fugit, a supervisory foreman, actively urged petitioner's employees to join the League. On one occasion Fugit called to his office an employee, Tindale, and asked him which side he was on. Tindale replied he did not belong to either, but believed in the outside union. Fugit told Tindale the outside union would cause him to lose his vacation, bonus, and seniority rights, and cost him dues of two dollars a month; that employee Schafer would call on him that noon and it would be well for him to "use his head" and join the League. Shortly thereafter, Brunson, an assistant foreman under Fugit, relieved Roach, an employee, while Roach went to Fugit's office. A few minutes thereafter Fugit called Tindale back to his office and told him Roach had signed up, and that it was only necessary to show Roach what he would lose and what it would cost him if he joined an outside union. When Tindale persisted in refusing to join the League, Fugit said, "I don't like to put the pressure on you, but I have to * * * How will it look when I have to report to the manager's office that you are the only man that won't sign up in this entire department." He then sent Tindale back to work with the final warning to "use your head * * * and sign up." During the discussion with Tindale, Fugit also said, "There was no reason why we couldn't have * * * a union among the men, their own union, because they had it working swell in every other place except Denver."

Fugit asked an employee, York, which union she was going to join, and when she replied the Amalgamated, he said, "Why don't you join up with our union * * You better think it over again if you know what is good for you; you will lose your seniority and your vacation and your bonus system."

Horwich, an assistant superintendent, "razzed" one member of the Amalgamated for his union connections; told another that the management would be more likely to deal with an inside union; gave an employee a detailed account of a purported scandal of an officer of the American Federation of Labor; told another employee that if the Board broke up the League it would be re-formed; characterized leaders of the Amalgamated as "Reds" and "Bolsheviks"; told one employee "there are ways to get you into the League"; told another employee that a company union had won elections and obtained high wages in other plants of petitioner; and in offering a promotion to another employee, urged him to give up his "Red" associates and stop his organization activities on behalf of the Amalgamated and his work on the Amalgamated grievance committee.

Knauss, a supervisory foreman, when employees in one department appeared at work wearing Amalgamated buttons, referred to their joining the outside union with profanity, and said, "I wonder if you think it is going to get you anywhere to belong to it? * * * You have an organization in here. What is the matter with it?"

Brandt, a supervisory foreman, told a member of the Amalgamated, "You better take 25 cents up to Frank O'Brien and join the company union; * * * or you will be on the outside looking in."

Fling, a supervisory foreman, asked various employees to which organization they belonged and urged them to join the League.

Petsch, an assistant supervisory foreman, rebuked an employee for changing from the League to the Amalgamated, saying, "Don't you know that this company union would be better for your job and yourself?"

These acts of the foremen took place during working hours and on the petitioner's premises.

---

[10] Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126.

While the Board's evidence in the main was sharply controverted, the weight of the evidence and the credibility of the witnesses were for the determination of the trial examiner and the Board.

Likewise, the inferences to be drawn from the evidentiary facts are fact questions to be determined by the Board and a finding of inferential facts made by the Board will not be disturbed by the court, if warranted by the evidence,[11] even though it permits of conflicting inferences.

While the evidence showed that Middaugh, the plant manager, and Young, the plant superintendent, repeatedly warned against violations of the National Labor Relations Act and solicitation of union membership on petitioner's premises during working hours, they took no effective means to stop repeated violations of the Act. Furthermore, with respect to the acts of the supervisory foremen, the doctrine of respondeat superior applies, and petitioner is responsible for the actions of its supervisory foremen, even though it had no actual participation therein.[12]

The findings of the Board with respect to the business carried on by the petitioner, the character of commerce in which it engages, and the labor organizations involved, are not here challenged and need not be referred to in detail.

The Board found that the Assembly Plan was dissolved at a meeting on April 20, 1937; that immediately thereafter the employee representatives of the Plan launched the formation of the League and commenced the circulation of petitions for membership in the League; that four employees solicited membership in the League on the company premises during working hours; that supervisory foremen had knowledge of such solicitation; that one supervisory foreman threatened employees with loss of vacation, bonus, and seniority rights unless they joined the League; that other supervisory foremen criticized and deprecated the outside unions, urged employees to join the League, told them they would be better off if they joined the League, and used coercive means to compel them to join the League. Based upon these subsidiary findings, the Board found:

"We find that the respondent [petitioner] has dominated and interfered with the formation and administration of the League, and has contributed support to it; that by its aforesaid acts, the respondent [petitioner] has interfered with, restrained, and coerced its employees in the exercise of their right to self-organization, and to form, join, and assist labor organizations."

On May 20, 1938, the Board entered its order. It directed:

That the petitioner cease and desist from in any manner dominating or interfering with the administration of the League, or any other labor organization of its employees, from the formation of any other organization of its employees, from contributing financial support to the League or any other labor organization of its employees, and from in any manner interfering with, restraining, or coercing its employees in the exercise of the right to self-organization, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection; and

That petitioner withdraw recognition from and completely disestablish the League as representative of petitioner's employees with respect to grievances, labor disputes, wages, rates of pay, hours of employment, or other conditions of employment;

"2(b) Post immediately, and keep posted for a period of at least thirty (30) consecutive days from the date of posting, notices to its employees in conspicuous places throughout the Denver plant stating that the respondent [petitioner] will cease and desist in the manner set forth in 1(a) and (b), and that it will take the affirmative action set forth in 2(a) of this Order"; and

Notify the Regional Director in writing within ten days from the date of the order the steps taken to comply therewith.

---

[11] Washington, V. & M. Coach Co. v. National Labor Relations Board, 301 U. S. 142, 147, 57 S.Ct. 648, 81 L.Ed. 965. National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 271, 58 S.Ct. 571, 82 L. Ed. 831, 115 A.L.R. 307; Texas & N. & O. R. Co. v. Brotherhood of Railway & S. Clerks, 281 U.S. 548, 560, 50 S.Ct. 427, 74 L.Ed. 1034; Swayne & Hoyt, Ltd. v. United States, 300 U.S. 297, 307, 57 S.Ct. 478, 81 L.Ed. 659.

[12] National Labor Relations Board v. A. S. Abell Co., 4 Cir., 97 F.2d 951, 956.

Petitioner urges that the Board's order is not supported by proper findings of fact. In dealing with the charge of unfair labor practices, the Board found the facts with respect to the dissolution of the Assembly Plan, the formation of the League, the solicitation of membership in the League on the petitioner's premises during working hours, the acts of the supervisory foremen in condemning Amalgamated and the United and membership therein and their endeavors to cause employees to join the League, and from these subsidiary findings made the ultimate finding above quoted.

 It is not essential that the Board state its findings in formal style. It is sufficient if it make findings which clearly and definitely state the basic facts upon which its ultimate conclusions and decision rest.[13] While it would have been better form for the Board to have set forth separately a clean-cut statement of the ultimate facts, without incorporating therein references to evidence or the reasoning by which the Board arrived at its findings,[14] we are of the opinion that the findings here are sufficiently definite to inform the petitioner of the basic facts found by the Board, upon which it predicated its ultimate conclusions and decision.

 Finally, petitioner urges that the cease and desist order should be modified. With this we agree. True, under Section 10 of the Act the Board has the right to exercise judgment and discretion as to the necessity for affirmative relief and the character of affirmative relief to be ordered.[15] But the affirmative act required by subdivision (b) of paragraph 2 of the order would be tantamount to an admission that petitioner had been guilty in the past of the unfair practices charged. Such admission should not be compelled.[16]

The order will be modified by substituting for subdivision (b) the requirement that petitioner display in conspicuous places throughout its Denver plant, for a period of thirty consecutive days, copies of the order of the Board, together with a statement that the order has been approved by this court, and is binding on the employer, and that it will abide by and comply therewith.

Let a decree be entered modifying the order of the Board as herein indicated and directing that the order, as modified, be enforced.

Opinion Denying Petition for Rehearing.

Swift & Company[1] has filed a petition for rehearing setting up two principal contentions: (1), that the evidence before the Board did not justify a finding of a violation of Section 8(2) of the National Labor Relations Act, 29 U.S.C.A. § 158(2), and (2), that the meaning of the disestablish order should be defined.

At the meeting of the representatives of the Assembly Plan[2] held on April 20, 1937, for the purpose of dissolving the Plan, Young, petitioner's plant superintendent, read a statement to the employee representatives of the Plan, which in part stated:

"Whether you wish to establish an employees' representation plan for collective bargaining, that will comply with the terms of the law, is a matter for you to decide. If you wish to adopt a plan for negotiating with the company on wages, hours, and working conditions, it should not include management participation in elections of employee representatives, the furnishing of printed material by the company, nor company compensation to employee representatives for time spent away from their work, except when conferring with management, as this latter is not prohibited by law."

The statement was posted on petitioner's bulletin boards. Young also furnished the employee representatives with a digest of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq.

The employee representatives asked and received permission of Young to remain in the assembly room. Acting on the

---

13 Saginaw Broadcasting Co. v. Federal Communications Commission, 68 App. D.C. 282, 96 F.2d 554, 560, 561.

14 National Labor Relations Board v. Thompson Products, 6 Cir., 97 F.2d 13.

15 National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 265, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307.

16 See National Labor Relations Board v. A. S. Abell Co., 4 Cir., 97 F.2d 951, 958–9; National Labor Relations Board v. Eagle Mfg. Co., 4 Cir., 99 F.2d 930, 932.

1 Hereinafter referred to as petitioner.

2 Hereinafter referred to as the Plan.

suggestion of Young, they immediately gave consideration to the formation of a local union and unanimously decided to start such an organization. The following morning they held a second meeting in the plant cafeteria for which they paid a nominal fee of one dollar. They adopted as a name for the new organization "Swift & Company Employees' Security League,"[3] and immediately commenced the circulation of petitions for membership in the League. Schafer, one of the employee representatives,[4] was very active in the formation of the League. He reported the action of the employee representatives to Young and Middaugh, the plant manager. Middaugh stated to Schafer that any organization would be recognized so long as it complied with the National Labor Relations Act. Young suggested that the petitioner's name be placed at the end instead of at the beginning of the name of the League. Thereafter, an intensive drive for membership in the League was carried on. There was much evidence, accepted by the Board as true, that supervisory foremen engaged in this drive on petitioner's premises and during working hours. Horwich, assistant superintendent, rebuked members of the Amalgamated Meat Cutters and Butcher Workmen of North America, Local No. 641,[5] a labor organization affiliated with the American Federation of Labor, for protesting against activities of League supporters during working hours.

Counsel for petitioner insist that the activities of Horwich and the supervisory foremen were ineffective. An officer of the Amalgamated testified that after supervisory foreman Knauss of the Beef Cutting Department had severely condemned certain employees in his department for joining the Amalgamated, such employees ceased to pay dues to the Amalgamated and dropped out of that organization, and when asked for the reason for so doing,

stated, "Well, we have got too much opposition from this other company union."

There was also testimony that the League enjoyed a very rapid growth and that the Amalgamated lost between 180 and 195 members, and that members who left the Amalgamated joined the League. Section 8 of the National Labor Relations Act, 29 U.S.C.A. § 158(2) in part reads as follows:

"Sec. 8. It shall be an unfair labor practice for an employer— * * * (2) To dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it * * *."

It is our view, supported we believe by the adjudicated cases,[6] that the activities of Young, Middaugh, Horwich, and the supervisory foremen constituted interference with the formation of the League and justified the disestablish order.

The disestablish order reads as follows:

"(a) Withdraw all recognition from Packing House Workers Security League, as a representative of its employees for the purpose of dealing with the respondent [petitioner] concerning grievances, labor disputes, wages, rates of pay, hours of employment, or other conditions of employment, and completely disestablish said Packing House Workers Security League as such representative."

We are of the opinion that the meaning of the order is sufficiently clear. It does not direct that the League shall be dissolved, but merely that the petitioner cease to recognize it as the collective bargaining representative of petitioner's employees. If it should be established in the future, after the Board's order has become operative and effected its purpose, that the League has been freely chosen by petitioner's employees as their collective bargaining representative, we do not con-

---

[3] Hereinafter referred to as the League.

[4] Schafer sometimes acted in the capacities of foreman and assistant foreman when the regular foreman or assistant foreman was absent on his vacation.

[5] Hereinafter referred to as the Amalgamated.

[6] National Labor Relations Board v. Fansteel M. Corp., 306 U.S. 240, 59 S. Ct. 490, 83 L.Ed. 627; Hamilton-Brown Shoe Co. v. National Labor Relations Board, 8 Cir., 104 F.2d 49, 52, 53; National Labor Relations Board v. Wallace Mfg. Co., 4 Cir., 95 F.2d 818, 820; National Labor Relations Board v. J. Freezer & Son, Inc., 4 Cir., 95 F.2d 840, 841; Cudahy Packing Co. v. National Labor Relations Board, 8 Cir., 102 F.2d 745, 746–752; National Labor Relations Board v. Kiddie Kover Mfg. Co., 6 Cir., 105 F.2d 179.

strue the order as preventing proper recognition of the League as such.

A copy of the foregoing paragraph of this opinion may be posted with the notice.

The petition for rehearing is denied.