## COLORADO FUEL & IRON CORPORATION v. NATIONAL LABOR RELATIONS BOARD.

No. 2097.

Circuit Court of Appeals, Tenth Circuit.

June 23, 1941.

Fred Farrar, of Denver, Colo. (Donald C. Swatland and W. T. Stewart, Jr., both of New York City, Farrar & Martin, of Denver, Colo., and Cravath, De Gersdorff, Swaine, & Wood, of New York City, on the brief), for petitioner.

A. T. Stewart, of Pueblo, Colo., for intervenor, Employees' Representative Organization.

Leonard Appel, of Washington, D. C. Atty., National Labor Relations Board (Robert B. Watts, Gen. Counsel, Laurence A. Knapp, Associate Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel, and Bertram Edises, Atty., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before PHILLIPS, HUXMAN, and MURRAH, Circuit Judges.

PHILLIPS, Circuit Judge.

The Colorado Fuel and Iron Company filed a petition for reorganization under § 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. The reorganization was effected and the Colorado Fuel and Iron Corporation was organized under the laws of Colorado. On July 1, 1936, it took over all the assets and property of the Colorado Fuel and Iron Company.[1]

Petitioner filed its petition herein to review an order of the National Labor Relations Board.[2] In its answer the Board sought enforcement of the order.

Petitioner is engaged in the manufacture of iron and steel products, the quarrying of limestone, and the mining of iron ore and coal. It owns an iron and steel mill at Pueblo, Colorado, known as the Minnequa Plant, a number of coal mines in Colorado, an iron ore mine at Sunrise, Wyoming, and other iron ore mines in Colorado, New Mexico, California, and Utah.

On June 17, 1938, the International Union of Mine, Mill and Smelter Workers, Local 442,[3] filed an amended charge alleging that petitioner had committed unfair labor practices at the Sunrise Mine. Local 442 is affiliated with the Committee on Industrial Organization.[4] On the same date, the Steel Workers Organizing Committee,[5] also affiliated with the C. I. O., filed an amended charge alleging that petitioner had engaged in unfair labor practices at the Minnequa Plant. The Board ordered the charges consolidated and filed its complaint against petitioner charging that it had dominated and interfered with the formation and administration of a labor organization at its Minnequa Plant, known as the Employees' Representatives' Organization,[6] and had dominated and interfered with the formation and adminis-

---

[1] The two corporations will be treated as one in this opinion and referred to as the petitioner.

[2] Hereinafter called the Board.

[3] Hereinafter called Local 442.

[4] Hereinafter called C. I. O.

[5] Hereinafter called S. W. O. C.

[6] Hereinafter called Employees' Organization.

tration of a labor organization at its Sunrise Mine, also known as Employees' Representatives' Organization, and had contributed financial and other support to such organizations in violation of § 8(1) and (2) of the National Labor Relations Act,[7] 49 Stat. 449, 29 U.S.C.A. § 158(1, 2), and had discouraged membership in the S. W. O. C. and in Local 442, and had refused to bargain collectively with Local 442 in violation of § 8(5) of the Act.

On June 28, 1938, the petitioner filed its answer denying the alleged unfair labor practices. On June 25, 1938, the Employees' Organization at the Minnequa Plant intervened in the proceeding and filed its answer denying the unfair labor practices at the Minnequa Plant.

A hearing was had in July, 1938, before an examiner. On October 22, 1938, the examiner filed his intermediate report, finding that petitioner had engaged in the unfair labor practices alleged in the complaint. The petitioner and the Employees' Organization at the Minnequa Plant filed exceptions which were argued orally before the Board. On March 29, 1940, the Board entered its decision and order. The order directed the petitioner to cease and desist from dominating or interfering with the two Employees' Organizations or the formation or administration of any other organization of its employees, and from contributing financial or other support to such Employees' Organizations or to any other labor organization of its employees; from giving effect to contracts entered into between the petitioner and the two Employees' Organizations; from refusing to bargain collectively with Local 442 as the exclusive representative of the production and maintenance employees at the Sunrise Mine; from in any other manner interfering with, restraining, or coercing its employees in the exercise of the rights guaranteed in § 7 of the Act, 29 U.S.C.A. § 157; to withdraw recognition from and completely disestablish the two Employees' Organizations as representatives of any of its employees for collective bargaining purposes; and upon request to bargain collectively with Local 442 as the exclusive representative of the production and maintenance employees at the Sunrise Mine.

## I. The Minnequa Case.

The evidence adduced at the hearing established these facts: In 1916, an employees' representation plan[8] was put into effect at the Minnequa Plant. A similar plan had been adopted at the petitioner's mines in October, 1915.[9] The plan was initiated by John D. Rockefeller, Jr., a large stockholder in petitioner, in order to provide a procedure by which dissatisfied workers could present their grievances to the management and thus improve industrial relations. It was submitted to a vote of the employees at the Minnequa Plant and approved by a large majority of such employees. The plan divided the Minnequa Plant into divisions and subdivisions and provided for the annual election in such units of employees' representatives from and by the employees. All non-supervisory and nonsalaried employees in the service of petitioner for three months or more were entitled to vote. Only employees in the service of petitioner for one year or more were eligible to serve as representatives. The tenure of an employees' representative automatically terminated if his employment with petitioner ceased. The plan was based on a system of joint representation of employees and management. There were four principal committees, namely the Joint Committee on Industrial Cooperation and Conciliation, the Joint Committee on Safety and Accidents, the Joint Committee on Sanitation, Health and Housing, and the Joint Committee on Recreation and Education. On each committee there were six persons selected by and from the employees' representatives and six persons selected by the management. At committee meetings an official of petitioner presided and an employees' representative acted as secretary. The first of the above-named committes had jurisdiction over terms and conditions of employment and the settlement of industrial disputes. The functions of the three remaining committees are indicated by their titles. Under the procedure established respecting grievances, an employee believing himself aggrieved was first required to take up his grievance with his immediate superior and unless and until the matter was adjusted with higher offi-

---

[7] Hereinafter referred to as the Act.

[8] Hereinafter called the plan.

[9] The plan continued in effect at the coal mines until 1933 when petitioner signed a contract with the United Mine Workers of America representing its employees at the coal mines.

cials, in the order of their rank, up to the president of petitioner. Thereafter, an appeal could be taken to the Joint Committee on Industrial Cooperation and Conciliation. The plan also provided for arbitration if mutually agreed to by the parties to the dispute. It also provided for joint conferences at four-month intervals, called and presided over by petitioner's president.

The plan was wholly financed by petitioner. There were no initiation fees and no dues. Petitioner also bore the expenses of the annual election of employees' representatives, reimbursed employees' representatives for expenses incurred on trips to the Eastern industrial section of the country to study comparative wage rates, and bore the cost of printing and distributing to the employees of the monthly Industrial Bulletin and the plan booklets.

The plan provided that petitioner's president should call the elections and decide all questions concerning the validity of the nomination or election of any employees' representatives. However, in practice the employees were in full charge of the election procedure. The elections were conducted in the plant during working hours and petitioner furnished the ballots and ballot boxes. The plan could be amended by a majority vote at a joint meeting at which all employees' and management representatives were present.

The plan made no provision for general meetings of the employees. The direct participation of the employees in the plan was limited to voting at the annual election. The plan expressly provided that there should be no discrimination by the petitioner on account of membership or nonmembership in any union. The plan was accompanied by a memorandum of agreement by which the petitioner agreed to maintain wage rates and working conditions conforming substantially with those of its competitors.

The Board found that the plan was dominated and controlled by petitioner and this, petitioner does not deny.

In September, 1935, the employees' representatives appointed a committee to revise the plan. On September 10, 1936, the revised plan which had been prepared by the employees' representatives was presented separately to the employees' representatives and the management representatives and unanimously approved by each group. The principal changes were these: (a) Control of election procedure was formally vested exclusively in the employees' representatives, as had long been the practice; (b) amendment of provisions relating to election procedure or relating exclusively to the employees could be made by the vote of a majority of the employees' representatives; (c) the plan could be terminated by a majority vote of the eligible employees at any annual election; (d) arbitration was made compulsory at the instance of either party. Expenses of the employees' organization were still to be borne by petitioner.

Election of employees' representatives under the revised plan was held in January, 1937. In such election, 23 representatives were re-elected and 11 representatives were chosen to replace former incumbents.

Following the decision of the Supreme Court of the United States in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, decided April 12, 1937, the employees' representatives, acting on their own initiative and without the participation of the management, undertook a further revision of the plan. Prior to taking this action, the employees' representatives asked the management for its views as to the effect of the Act on the existing plan and were advised by the management that the petitioner could not in anywise interfere with any employees' organization.

On May 10, 1937, a meeting of the employees' representatives was held. Mr. Diamond, chairman of the employees' representatives, stated that the large steel companies had abandoned their employees' representation plans and that the officers of the employees' representatives had decided to review the plan and determine if any changes were necessary to bring it into conformity with the Act. A revision committee of nine members was appointed by the employees' representatives to draw up a revised plan and submit it to the employees' representatives for approval. It was decided that the revision committee should be paid for its work from the employees' organization fund.[10]

---

[10] Prior to April, 1935, Diamond had advocated the collection of a separate fund for the employees' representatives. At a meeting held April 19, 1935, the employees' representatives voted to establish a fund. Collections for such fund were begun soon after that date.

At a meeting of the employees' representatives held May 28, 1937, the changes proposed and reported by the revision committee and various other additions and changes suggested at the meeting were approved by the employees' representatives. At a meeting of the employees' representatives held June 18, 1937, the revision committee reported the revised plan and a memorandum of agreement which were approved by the employees' representatives. After negotiations between the officers of the employees' representatives and the management, the memorandum agreement was signed by the petitioner and the revision committee on June 21, 1937. While the contract was the result of negotiations between the employees' organization and the management, the revision of the by-laws was in nowise participated in by the management.

The new organization was called Employees' Representatives' Organization. The revised plan was divided into two parts, one being the by-laws of the Employees' Organization and the other a contract with petitioner.

As a basis of representation, the by-laws divided the plant into divisions and subdivisions and provided that employees in each division or subdivision should annually elect from among their number representatives to act on their behalf with respect to employment, living, and working conditions, the adjustment of differences, and other matters of mutual concern and interest, and that the elected representatives should hold regular monthly meetings; that all annual and special elections of employees' representatives should be conducted by a committee of five employees' representatives elected by the body of representatives; that after each annual election, the representatives should immediately meet for the purpose of electing a chairman, a vice-chairman, a secretary, an election committee, and members to serve on the following committees: Committee on Cooperation, Conciliation and Wages, Committee on Safety and Accidents, Committee on Sanitation, Health and Housing, and Committee on Recreation and Education; that each committee should consist of six employees' representatives; that the members of each committee should select a chairman and secretary, arrange its own procedure, and confer with the management monthly.

They further provided that the annual nomination and election of representatives should be held during the first half of the month of January unless deferred by the representatives' election committee; that notice of nomination and election, indicating the time and place thereof and the number of representatives to be elected in each division or subdivision, should be conspicuously posted one week in advance and should state that wage-earning employees should be entitled to vote; that no foreman or official having authority to employ or discharge should have the right to vote or serve as an employees' representative nor to be present at the meeting held for the election, and that the election committee should decide any question of eligibility.

They further provided that an employee, to be qualified for nomination and election as an employees' representative, should be a citizen of the United States, 21 years of age or over, and an employee of petitioner for at least one year immediately prior to his election; that the basis of representation should be one representative for each 150 wage earners or major fraction thereof, but that regardless of the number of employees therein, each division should be entitled to two representatives and each subdivision to one representative, and that representatives should serve for a term of one year and until their successors had been elected and qualified; that nomination and election of representatives should be by secret ballot under conditions insuring freedom of choice and an impartial count; that each employee entitled to vote should write the name or names of a fellow employee or employees in his division or subdivision whom he desired to nominate as representative, and himself deposit the nomination ballot in the ballot box; that each employee could nominate representatives equal to the number to which his division or subdivision was entitled; that such number should be stated on the nomination ballot; that the persons equal to twice the number of representatives to be elected from the division or subdivision, receiving the highest number of nomination votes, should be regarded as nominated; that the tellers should make out in alphabetical order the list of the duly nominated candidates and post them in each subdivision not later than the day preceding the election; that election of representatives should be by secret ballot,

containing the names of the nominees in alphabetical order; that a representative should cease to hold office upon severance of his relations with petitioner, or upon his permanent appointment to a position which would disqualify him from voting or acting as a representative; and that the expenses of employees' representatives and elections should be borne by employees from funds derived from assessments fixed by the employees' representatives not to exceed 25 cents per month.

They provided that meetings of employees in any division or subdivision or conferences of employees' representatives might be held at any time which would not interfere with operations, to consider and make recommendations concerning any matters pertaining to employment, working, and living conditions, and like matters.

They provided that the by-laws could be altered or amended by a majority vote of the regularly elected representatives of the employees, and that the plan could be terminated by a majority vote of all eligible employees at any annual election.

The memorandum agreement entered into on June 21, 1937, between the representatives of the employees and the petitioner provided that the agreement was subject to revision upon 90 days'. notice by either party; that wage rates then in force in the several subdivisions conformed substantially with wage rates for like work under similar conditions in effect with competing steel companies, and that similarity of rates with competing companies should be maintained; that working conditions then in force should continue, subject to adjustment and regulation in conformity with conditions in effect in operations conducted by petitioner's competitors; that for the purpose of making changes in wages or working conditions, a joint meeting of employees' representatives in the divisions affected and officers of the petitioner should be called within 30 days after any change in wages or working conditions in competitive companies should become effective, to discuss and determine an equitable method for fixing the new schedule of wages or working conditions in the departments concerned; that wages should be paid semimonthly and no deduction should be made from earnings except where authorized by employees; that the hours of labor should be eight hours per day with time and one-half for more than eight hours in any one day, and time and one-half for more than forty hours in any one week, but that no employee should be paid both daily and weekly overtime for the same hours so worked; that future changes in hours of labor should be by agreement between employees' representatives and the management; that any employee believing himself to be subjected to unfair conditions or treatment should first seek to have the conditions or differences complained of adjusted by conference, in person or through his regularly elected representative, with the foreman or superintendent or the personnel assistant to the general superintendent, in the order named; that in case the decision by the superintendent of the department concerned was unsatisfactory, the case might be appealed to the general superintendent or his personnel assistant; that if such appeal failed to produce a result satisfactory to the employee or employees involved, or the representative, the case might be appealed to a regular or special meeting of the Committee on Cooperation, Conciliation and Wages; that when such committee "is called upon to act with reference to any differences, except by consent of all present, the committee shall not proceed with any important part of its duties unless both sides are equally represented. Where agreeable, equal representation may be effected by the withdrawal of one or more members from the side of the committee having the majority"; that should the committee be unable to reach a decision by a majority vote, the case might be appealed to the vice-president and president, in the order named; that if the settlement proposed by the president should be unsatisfactory, the matter should, at the request of either party, be submitted to arbitration by a board of three members, one appointed by the employees' representative members of such committee, one appointed by the management, and the third selected by mutual agreement of the two; that the decision of the majority of such board of arbitration should be final and binding upon the parties; that decisions made should be retroactive to the date of the formal complaint to the department superintendent; that the management reserved the right to hire and discharge, but that there should be no discrimination by the management or by any of the employees on account of membership or nonmembership in any society, fraternity, or union; that a dis-

charge should be subject to review; that if any employee should be discharged or suspended by the management and a claim of injustice made, an investigation should be promptly conducted under the procedure for the adjustment of grievances, and should it be decided an injustice had been done, the discharged employee should be reinstated with back pay; that there should be posted in each division and subdivision a list of offenses, for the commission of which an employee might be discharged without notice; that for other offenses an employee should not be discharged without first having been notified in writing that a repetition of the offense would be cause for dismissal; that employees might hold meetings on company property or elsewhere outside of working hours or on idle days.

It also covered provisions respecting holidays, wash houses, and prices of domestic coal, and prescribed the duties of the Committee on Safety and Accidents, Committee on Sanitation, Health and Housing, and the Committee on Recreation and Education. It provided that the Committee on Cooperation, Conciliation and Wages should have to do with matters pertaining to the prevention and settlement of disputes, terms and conditions of employment, including wages, hours, working conditions, maintenance of order and discipline, company stores, and like matters. It provided that conferences between the employees' representatives and management should be held every three months; that such conferences should be called by the chairman of the employees' representatives; that at such conferences there should be free discussion of matters of interest and concern, embracing increased efficiency, production, improvement of living and working conditions, discipline, and matters to strengthen friendly and cordial relations between management and employees; that the last quarterly meeting should be held in December, at which condensed reports covering the work of the year should be made by each of the committees; that special meetings might be called at any time by request of the chairman of the employees' representatives or of a majority of the employees' representatives.

At the 1938 election, held in February of that year, for the election of employees' representatives, a special vote was taken on the question, "Do you ratify the representation plan and the memorandum of agreement and designate the elected representatives as your collective bargaining agency?" The vote was a secret vote, supervised by the employees' representatives' election committtee. The management had no part in it. The tellers explained to the employees "that they could have anything they wanted. If they wanted our representative plan as it was, or if they wanted anything else, they could have it." Approximately 98 per cent of the employees eligible to vote participated in the ballot. 2426 employees voted in favor of the revised plan and agreement and in favor of having the representatives elected act as their collective bargaining agency; 198 voted against such proposals. The findings of the Board intimate that the ballot was not secret. The evidence is to the contrary.

On April 4, 1938, Diamond and Irwin, chairman and vice-chairman, respectively, of the employees' organization, sent a letter to petitioner requesting exclusive recognition of the employees' organization as the sole bargaining agency of the employees. The requested recognition was granted by petitioner on April 7, 1938.

A new contract was signed on April 15, 1938. It provided that the agreement should be subject to revision on 30 days' notice by either party, and that if agreement on revision should not be reached within 60 days after negotiations had been initiated, the agreement should automatically terminate. It further provided that if appeal to the general superintendent or his personnel assistant should not produce a result satisfactory to the employee or employees or the representative concerned, "the case may then be appealed to a regular or special meeting of the Committee on Cooperation, Conciliation and Wages, this Committee consisting of six members of the Representatives' Organization, who are empowered to meet and deal with the Management of the Minnequa Plant for the purpose of settling disputes." It provided also, as in the old contract, that if such committee should be unable to reach a decision satisfactory to both management and representatives, an appeal might be taken to the vice-president and president, in the order named, and, if the decision of the president should be unsatisfactory, for arbitration.

The Board intimates in its opinion that the plan was not an effective bargaining agency. Under the plan a wage scale has

172

been maintained in substantial conformity to the wage scale of petitioner's competitors in the Chicago and Pittsburgh areas and higher than its competitors in the St. Louis, Kansas City, and Birmingham areas. The employees' representatives succeeded in obtaining an eight-hour day on November 3, 1918, and a ten per cent increase in hourly pay and time and one-half for work in excess of eight hours. Petitioner was the first steel company in this country to adopt the eight-hour day. In 1923, Eastern steel companies adopted an eight-hour day for continuous operations and a ten-hour day for other operations. Following this, the committee of the employees' representatives at the Minnequa Plant visited the steel companies in the Pittsburgh and Chicago areas. On October 16, 1923, following the committee's return, a conference was held between representatives of the management and the employees' representatives, at which a twelve per cent increase in wages was demanded by the latter. The petitioner proposed that it abandon the eight-hour day which it had adopted in 1918 and conform with a new schedule of working hours adopted by the Eastern companies. This and other counter-proposals made by petitioner were separately considered by the employees' representatives and rejected and at the conclusion of the bargaining a twelve per cent increase in pay was granted.

In 1925 the management proposed that men working in the rail mill who were paid on a basis of tonnage output should receive a twenty per cent reduction in the tonnage rate. The matter was brought before the Committee on Cooperation, Conciliation and Wages. It was referred to a committee of six, consisting of three employees' representatives and three management representatives. The employees' representatives on the committee visited many rail mills throughout the country. Upon returning, they recommended a cut of only five per cent for the rail mill workers and their proposal was accepted by petitioner. In 1934 the Eastern steel companies granted a general ten per cent increase. Petitioner conceded that this increase should be granted at the Minnequa Plant, but contended that workers on certain jobs were receiving either too low or too high a

wage in comparison with men doing like work in the plants of competitors. Petitioner proposed a ten per cent increase, except in cases where it asserted the rate was out of line, as to which it proposed increases varying from five to fifteen per cent. The employees' representatives objected to the proposal and insisted on a flat ten per cent increase. After several conferences, a straight ten per cent increase was granted on April 27, 1934. In the spring of 1937, another ten per cent increase was granted on demand of employees' representatives. From 1933 to the date of the hearing, wage adjustments were made pursuant to the machinery provided for adjusting grievances on approximately 460 occasions. Of these, 420 were individual wage grievances and the remainder affected small groups and in some cases, departments. During the years 1935, 1936, and 1937, 340 grievances were considered and adjusted. Of these, 179 were adjusted in conformity with the claims of the employees or their representatives. While these facts do not justify a labor organization which does not conform to the requirements of the Act,[11] they are indicative of why the employees may desire their own local organization patterned on the plan, but freed from its objectionable features.

Meetings of the employees' representatives have been held at the steel works Y. M. C. A. in a building owned by the petitioner operated for the employees, but a large majority of the employees are dues-paying members of the Y. M. C. A. The 1938 election was held on company property during working hours. On one occasion a foreman acceded to a request of an employees' representative that other workers should be asked to make collections for the fund of the employees' organization, since they could more easily make the collections without interference with their work. The foreman did none of the collecting himself.[12] The petitioner publishes an Industrial Bulletin. It contains minutes of the meetings of the four committees with the management and of the quarterly conferences. It does not publish the minutes of the meetings of employees' representatives. The petitioner distributes booklets containing the plan and the agreement to new employees. The employees'

[11]Labor Board v. Newport News, etc., Co., 308 U.S. 241, 251, 60 S.Ct. 203, 84 L.Ed. 219.

[12] Petitioner refused to grant the check-off system and made collections only upon written orders from employees.

representatives have distributed the booklets to the old employees. Petitioner pays the employees' representatives for the time lost from work in the preliminary meetings held four times a year on the mornings of the days when the quarterly conferences are held. These morning meetings are an integral part of the conferences, because the purpose is to assemble information with respect to matters to be taken up at the formal afternoon meetings, and representatives of the management are frequently present at the morning meetings. Except as above stated, petitioner has made no contribution to the Employees' Organization since the 1937 revision.

Although there was evidence that the petitioner actively discouraged membership in Local 442 at Sunrise, there was no evidence that it affirmatively discouraged membership in the S. W. O. C. at the Minnequa Plant.

After petitioner had filed its petition for review in this court, it filed a petition setting out that on February 12, 1941, the Board ordered an election at Pueblo; that the election was held on March 14, 17, and 19, 1941; that the ballot gave the employees the option of voting for the S. W. O. C., the Western States Steel Products Union, or neither; that the election was held under the direction of the Regional Director; that his report of the election was as follows:

| | |
|---|---:|
| Total on eligible list | 5,317 |
| Total votes cast | 4,838 |
| Total ballots challenged | 51 |
| Total blank ballots | 4 |
| Total void ballots | 11 |
| Total valid ballots cast | 4,772 |
| Votes cast for S. W. O. C. | 1,783 |
| Votes cast for Western States Steel Products Union | 319 |
| Votes cast for neither | 2,670 |

Petitioner prayed for an order directing the Board to take additional evidence, to be made a part of the transcript of the record on appeal, of the facts respecting the ordering and holding of the election, and the result.

The present Employees' Organization had its inception in the plan which admittedly did not conform with the requirements of the Act. That the employees, acting on their own initiative, made an earnest effort to so revise the plan as to bring it into conformity with the Act, cannot be doubted. Likewise, it cannot be doubted that they had the right to form and join their own local unaffiliated organization. The issue presented is whether they were accorded the freedom of choice guaranteed by the Act.[13]

We are of the opinion that the by-laws under the 1937 revision, standing alone, are free from objection, but they are limited by the provisions of the two contracts entered into with petitioner, in the formulation of which petitioner had a part. The duties and powers of the several committees of the Employees' Organization are defined and limited by the agreement. The powers and duties of such committees as representatives of the employees should be defined in the by-laws freely adopted by the employees without leave or hindrance by petitioner. The April 15, 1938 contract prescribed the divisions and subdivisions from which the employees' representatives should be elected and for their biennial election, and thus encroached upon the right of the Employees' Organization to formulate and change its own by-laws.[14]

The 1936 and 1937 revisions were formulated by employees' representatives elected under the old plan and they continued to act until the 1938 election, as did the committees selected under the old plan.[15] There was no line of fracture between the old plan and the new Employees' Organization to disabuse any belief of the employees that they would win petitioner's approval if they came into, or incur its displeasure if they remained out of, the new organization.

While the employees at the election in February, 1938, overwhelmingly approved the Employees' Organization, there had been no manifestation by petitioner to its employees as a whole that they were free

---

[13] Labor Board v. Newport News, etc., Co., 308 U.S. 241, 250, 60 S.Ct. 203, 84 L.Ed. 219; Labor Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 360, 361, 85 L.Ed. 368.

[14] Labor Board v. Newport News, etc., Co., 308 U.S. 241, 249, 60 S.Ct. 203, 84 L.Ed. 219.

[15] See Swift & Co. v. Labor Board, 10 Cir., 106 F.2d 87, 92; Magnolia Petroleum Co. v. Labor Board, 10 Cir., 115 F. 2d 1007, 1010; Westinghouse Electric & Mfg. Co. v. Labor Board, 2 Cir., 112 F. 2d 657, 660.

to choose either the Employees' Organization or some other labor organization.[16]

The original contract entered into in June, 1937, limited the number of. employees' representatives, when acting with respect to grievances, to an equal number of management representatives. This, of course, was corrected by the revised 1938 contract, but is an indication of domination in 1937.

█ Employees' representatives are paid by petitioner for lost time while engaged in their duties as representatives of the Employees' Organization at the monthly and quarterly conferences held with petitioner's representatives. We think the employees' representatives should be paid by the Employees' Organization rather than by petitioner when they are engaged in the performance of their duties as employees' representatives, and thus be freed from any possible influence of favor from petitioner.

█ While the election held in 1941 is a strong manifestation that the employees desire their own local organization, we do not think that sending the case back to the Board to ascertain the facts respecting that election would change the result here.

What was said by the Supreme Court in Labor Board v. Newport News, etc., Co., 308 U.S. 241, 250, 60 S.Ct. 203, 208, 84 L.Ed. 219, is apposite:

"While the men are free to adopt any form of organization and representation whether purely local or connected with a national body, their purpose so to do may be obstructed by the existence and recognition by the management of an old plan or organization the original structure or operation of which was not in accordance with the provisions of the law. Sec. 10(c) [29 U.S.C.A. § 160(c)] was not intended to give the Board power of punishment or retribution for past wrongs or errors. Action under that section must be limited to the effectuation of the policies of the Act. One of these is that the employes shall be free to choose such form of organization as they wish.

"As pointed out in National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307, disestablishment of a bargaining unit previously dominated by the employer may be the only effective way of wiping the slate clean and affording the employes an opportunity to start afresh in organizing for the adjustment of their relations with the employer."

█ While a number of the Board's subsidiary findings are not in accord with the evidence, we conclude that to insure that absolute freedom of choice, the Board's order should be enforced.

## II. The Sunrise Case.

In 1916 a plan similar to the Minnequa plan was put into operation at the Sunrise Mine. The mine was shut down from November, 1937 until February 14, 1938. About February 1, 1938, certain employees at the mine initiated the organization of Local 442. On February 6, 1938, 43 employees met and elected officers. At a meeting held on February 17, 1938, at which 100 or more employees were present, the officers were installed and a bargaining committee of three members was selected.

On February 8, 1938, Bierleffi, the mine foreman, requested Krionderis, secretary-treasurer of Local 442, to disclose to him the names of the other officers and told him petitioner would never recognize a union, and that if he found out who the leaders were, "We will send them down the road." Bierleffii also told Denver, president of Local 442, that he "was a damn fool for joining up with the C. I. O." Shortly thereafter, Wright, superintendent of the mine, told Denver he was afraid petitioner might not recognize Local 442 and might close down the mine, stating petitioner could obtain iron ore as easily from New Mexico or Utah as from Sunrise. On February 9, 1938, Bierleffii told Balzan, one of the trustees of Local 442, "you know this kind of stuff has been tried before and there is no use trying it because we would just as well move out."

By February 18, 1938, 87 of the 138 employees at Sunrise had designated Local 442 to represent them as a collective bargaining agency. The bargaining committee consisting of Strong, Hart, and Palmer, and Murray, a representative of the C. I. O., called on Wright, advised him of their desire to bargain collectively, and presented him with a proposed contract. Wright stated he had no authority to bargain with the committee but would forward the contract to his superiors. The contract

---

[16] Westinghouse Electric & Mfg. Co. v. Labor Board, 2 Cir., 112 F.2d 657, 660; Labor Board v. Falk Corporation, 308 U. S. 453, 462, 60 S.Ct. 307, 84 L.Ed. 396.

was eventually delivered to vice-president Maxwell of petitioner. In February, 1938, De Fond and other employees began to circulate a petition authorizing petitioner to deduct 25 cents a month from the pay check of each signer and turn it over to the employees' representatives. Foremen and straw bosses assisted in obtaining signatures on the petition.

On February 20, 1938, Bierleffi told Strong, a trustee of Local 442, and a member of its bargaining committee, that if the union continued its activities the mine would shut down; that petitioner would cut off everybody's credit; would compel everyone to take a physical examination and would dismiss many old employees.

On February 21, 1938, Rupp, manager of mining operations for petitioner, made arrangements with De Fond, Morgan, and Whitney, plan proponents, to take a group of employees to Pueblo to study the workings of the plan at the Minnequa Plant. At a meeting held in the Y. M. C. A. on February 23, 1938, Morgan, a plan proponent, and Palmer, a member of Local 442 bargaining committee, were chosen to make the trip. Palmer demurred on the ground he did not care to go without consulting Local 442. Rupp told him his expenses would be paid and that Hart, another member of the bargaining committee, could go along. Palmer and Hart still indicated reluctance to go and Rupp criticized the union. Eventually, Palmer and Hart agreed to go. While at Pueblo, Maxwell told the committee that in case of labor troubles they could get ore from New Mexico and assured them that the employees would be taken better care of at Sunrise and any grievance would be acted on, and admonished them to go back and work out a plan of their own. Palmer brought up the question of the proposed contract with Local 442 and Maxwell stated he could not sign a contract of that kind and he doubted if Roeder, president of the petitioner, would. Upon return of the committee to Sunrise, Morgan, plan proponent, called a meeting for March 2. About 140 employees attended. Morgan and others reported on the trip to Pueblo. A committee was selected to hold elections under the plan and it was decided to increase the number of employees' representatives for the mine from two to four. Shortly thereafter, Local 442 held a meeting to determine whether it would drop the plan or follow along with it for awhile. It was first voted to adhere to Local 442. Various employees brought up petitioner's threats to shut down the mine and Palmer pointed out the men were not strong enough to "make the C. I. O. stick" and counseled "we had better not vote ourselves out of a job." After further discussion, it was decided to accept the plan for the present and to attempt to elect members of Local 442 as representatives. It was understood that in any event the men would retain the union, keep up the dues, and keep the C. I. O. back of them. It was also decided to file charges of unfair labor practices with the Board. The newly-elected employees' representatives met on March 16, 1938, and with the assistance of other employees proceeded with the revision of the plan. The by-laws and memorandum agreement at the Minnequa Plant served as a basis. By-laws were adopted and a memorandum agreement dated April 14, 1938, was executed by petitioner and employees' representatives. The agreement covered the duties of the committees and the divisions from which employees' representatives were to be elected and provided for annual election of representatives. The agreement was printed by petitioner in a booklet which was distributed to the employees with their pay checks.

▇▇▇ The foregoing facts fully support the findings of the Board with respect to the Sunrise Case.

The order of the Board directing the petitioner to bargain with Local 442 is challenged on the ground that it was not shown a majority of the employees within the appropriate unit at Sunrise Mine were members of Local 442 at the time the order was made.

The evidence established that on February 18, 1938, 87 of the 138 employees in the appropriate unit had joined Local 442; that at the meeting held in March, 1938, the employees decided to retain the union, keep up their dues, and file charges against petitioner.

▇▇▇ A majority of the employees having selected Local 442 as its bargaining agent in the spring of 1938, it may be presumed that that authority continued, absent a contrary showing that they voluntarily rescinded it.[17]

---

[17] Labor Board v. Highland Park Mfg. Co., 4 Cir., 110 F.2d 632, 640; M. H. Ritzwoller Co. v. Labor Board, 7 Cir., 114 F.2d 432, 438; Oughton v. Labor Board, 3 Cir., 118 F.2d 486, 498.

Furthermore, it is a reasonable assumption that any diminution in the membership of Local 442 was due to the wrongful acts of petitioner. An employer should not be allowed to discredit a duly designated bargaining agent by his own wrongful acts and then take advantage of the loss of membership due thereto as an excuse for not recognizing it as a bargaining agent.[18]

The order of disestablishment is not to be construed as in anywise limiting the employees' freedom of choice as to a labor organization or bargaining agent, but as leaving them wholly free and without restraint, interference, or coercion by petitioner, to form or join any organization, whether it be purely local if truly independent, or affiliated with a parent body.

A copy of the foregoing paragraph of this opinion may be posted with the notice. See Swift & Company v. Labor Board, 10 Cir., 106 F.2d 87, 96; Cudahy Packing Company v. Labor Board, 8 Cir., 102 F.2d 745, 753.

The order will be enforced.

---

[18] Continental Oil Co. v. Labor Board, 10 Cir., 113 F.2d 473, 481; Labor Board v. Highland Park Mfg. Co., 4 Cir., 110 F.2d 632, 640; Bussmann Mfg. Co. v. Labor Board, 8 Cir., 111 F.2d 783, 788; Labor Board v. Bradford Dyeing Association, 310 U.S. 318, 340, 60 S.Ct. 918, 84 L.Ed. 1226; Oughton v. Labor Board, 3 Cir., 118 F.2d 486, 498.